448 So.2d 1340 (1984)
Carlyle A. ROGILLIO
v.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC. and John R. Runnigen.
No. CA-1229.
Court of Appeal of Louisiana, Fourth Circuit.
March 14, 1984.
*1342 Walter C. Thompson, Jr., Camilo K. Salas, III, Sessions, Fishman, Rosenson, Boisfontaine & Nathan, New Orleans, for plaintiff-appellant.
William R. Forrester, Jr., W.L. West, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, for defendants-appellees.
Before GULOTTA, SCHOTT and LOBRANO, JJ.
LOBRANO, Judge.
This case arises out of litigation concerning a trading activities error in the commodity trading account of appellant, Carlyle A. Rogillio by appellees, Merrill Lynch, Pierce, Fenner and Smith, Inc. (hereinafter, Merrill Lynch) and their employee, John R. Runnigen (hereinafter Runnigen). The complex facts of this case are as follows:
Appellant had been a stock account client of appellee, Merrill Lynch, for nearly twenty years. On October 2, 1978, appellant opened a commodities trading account with Merrill Lynch, the handling of which was undertaken by Runnigen. He was duly registered as a commodities broker with the Commodities Futures Trading Commission and with the Securities and Exchange Commission and various state regulatory authorities. Because of the intensity of his trading activities, Merrill Lynch and Runnigen considered appellant to be one of their more sophisticated clients. As such, appellant was required by Merrill Lynch to put up minimum margin requirements on his commodities contracts and was granted a $100,000 trading limit for the overall risk capital in his account.
In May, 1980, appellant diversified his commodities trading which had previously been primarily in copper, lumber and foreign currencies to include gold futures contracts. The gold futures contracts traded in May, 1980, and the subsequent July, 1980 contracts which are in dispute were all traded through the COMEX (commodities exchange) in New York.
On July 10, 1980 appellant sold "short" two February, 1982 gold contracts at $776.00 per ounce. On July 23, 1980, he sold one February, 1982 contract at $756.00 per ounce, and another at $753.00 per ounce. His objective was to repurchase these contracts at a subsequent date when the price of gold dropped, thus realizing a profit. He had prepared a sophisticated strategy based on the price of August, 1980 gold to guide him as to the proper timing to repurchase the contracts. As of July 29, 1980, appellant was "short" four 1982 gold contracts, and it is the liquidation *1343 of those contracts which forms the basis of this litigation.
All parties agree as to the events of July 29, 1980. On that day, the trend in the gold market was moving against appellant's short position. Specifically, the price of August, 1980 gold was moving upward. Pursuant to a request by appellant earlier that same day, Runnigen telephoned him when the August, 1980 gold price passed through the $650.00 per ounce mark. During the course of that conversation, appellant made the decision to liquidate his four short February, 1982 gold contracts which meant that Runnigen had to buy four offsetting contracts. Instead, Runnigen sold four contracts. The testimony of both appellant and Runnigen is consistent and explains how and why the error occurred.
Although it was clearly understood by both appellant and Runnigen that appellant wanted to liquidate his short position, they both erroneously used the word "sell" (rather than "buy") when they referred to the transaction. During the telephone conversation, Runnigen filled out the order ticket which is needed to convey the order to the floor of the exchange in New York. On that ticket Runnigen correctly circled the abbreviation "L" (for liquidating transaction) which indicated that appellant wanted to liquidate his short position. However, Runnigen erroneously wrote the abbreviation "SL" (for "sell") rather than the word "buy". By so doing, he was in fact entering an order to sell short four additional February 2, 1982 gold contracts (rather than to buy the four needed to liquidate appellant's short position) at $768.00 per ounce. Runnigen also circled the word "DAY" to signify a "day-only-order" meaning that if the order was not filled by the end of the date (July 29, 1980), it would automatically be cancelled and could not be re-entered the next day.
In keeping with procedure, Runnigen read back to appellant the order he had actually entered on the ticket. Runnigen then telephoned the COMEX (exchange) and placed an order to sell four February, 1982 COMEX gold future contracts at $768.00 per ounce. The order was filled the same day. As a result of this transaction appellant's account, instead of being liquidated, now included a short position of eight February, 1982 COMEX gold futures contracts.
On July 30, 1980, Runnigen became aware that he had in fact "doubled" appellant's position to a total of eight short contracts. Following discovery of this error on the afternoon of July 30, 1980, Louis McArdle, bookkeeper at Merrill Lynch's New Orleans office, wired its New York office instructing the error department to correct the erroneous transaction of July 29, 1980. In response to that wire, appellant's gold contracts were liquidated at the opening of the exchange on July 31, 1980 (two days later than he intended to liquidate) at a price of $729.00 per ounce generating an unexpected profit of $14,134.00 instead of the $1,466.00 loss which appellant had anticipated. The four additional February, 1982 gold contracts mistakenly sold were cancelled from appellant's account and liquidated at the $729.00 per ounce price generating a profit of $15,600.00.
On the morning of July 31, 1980, Runnigen telephoned appellant pursuant to the instructions of his operations manager to double-check the positions in appellant's account. Runnigen confirmed that appellant had intended to liquidate his short position and get out of the gold market completely on July 29, 1980.
Written confirmation of all the activities surrounding the error of July 29, 1980 were mailed to appellant in the usual course of business. His Commodity Account Activity report and State of Commodity Account for August, 1980, reported to appellant that his four short February, 1982 gold contracts were liquidated as of July 31, 1980 for a net profit of $14,134.00 and that the unauthorized sale of the four additional February, 1982 gold contracts were cancelled and the $15,600.00 profit transferred to Merrill Lynch's error account.
*1344 On February 20, 1981, appellant filed suit against Merrill Lynch and Runnigen seeking recovery of the $15,600.00 profit which accrued to Merrill Lynch's error account as a result of the error and for $325,000.00 of lost profits resulting from the alleged wrong doing. After trial on the merits, judgment was rendered dismissing appellant's suit. Appellant now perfects this appeal asserting the following assignments of error.
1. The decision reached by the District Court is contrary to the law and the evidence.
2. The District Court erred in not finding that defendants violated the provisions of the Commodity Exchange Act and the regulations enacted thereunder.
3. The District Court erred in not finding that the defendants breached their fiduciary duties owed to plaintiff.
4. The District Court erred in finding that there was no ratification by the plaintiff of the unauthorized trades carried out by the defendant.
5. The District Court erred in finding that the defendants' actions were consistent with the industry practice, and that said practice is not contrary to the law.
6. The District Court erred in not finding that defendants violated the provisions of the Louisiana Blue Sky Law.
After a careful review of the record we find no manifest error, and therefore affirm the lower court's decision.
ASSIGNMENT OF ERROR NUMBER 1 AND 5.
It is uncontroverted that neither appellant nor Runnigen intended to sell for appellant's account the four additional February, 1982 gold futures contracts although both parties used the word "sell". The trial court concluded that Runnigen made an error in carrying out the intentions of the parties, but properly characterized the error as mutual since the new positions created in appellant's account did not reflect the intent of either party.
The court's finding of mutual error is based upon totally uncontroverted facts and therefore, the Court's conclusion that Merrill Lynch could retain the profits from the four additional contracts is proper under the circumstances.
The Louisiana Civil Code provides that error as to the nature of a contract renders the contract void. Specifically, Article 1843 provides:
Error as to substance
"There is error as to the substance, when the object is of a totally different nature from that which is intended. Thus, if the object of the stipulation be supposed by one or both the parties to be an ingot of silver, and it really is a mass of some other metal that resembles silver, there is an error bearing on the substance of the object."
The error which occurred on July 29, 1980 was an error as to the substance of the contract. It related to the principal and sole object of the contract, to wit: the position created by the sale of the four additional February, 1982 gold contracts. Such an error rendered the contract invalid. It did not require the concurrence of appellant and cannot enure to his benefit because he was never a party to that sale. La.C.C. Arts. 1819, 1823 and 1843.
The testimony of Runnigen and the two experts confirm that Merrill Lynch followed the custom of the brokerage industry in not considering appellant to have any interest whatsoever in the four contracts erroneously placed in his account. This custom is consistent with our Civil Code. Since appellant never intended to sell the four additional contracts, never consented to the creation of the new position and bore no risk as to the contracts, the custom of the industry does not require Merrill Lynch to offer him the profit resulting from their liquidation.
The trial court recognized that the industry practice follows the common *1345 sense principle that since the party at risk must cover any loss on the trade, it is entitled to the profit should there be one. The court correctly concluded that since appellant could not be held liable for any adverse consequences of the unauthorized trades, he was not entitled to the profit made from the liquidation of those transactions.

ASSIGNMENT OF ERROR NUMBER 2.
An analysis of appellant's argument that Merrill Lynch and Runnigen violated the Commodity Exchange Act shows that the suggested factual bases and assumptions of appellant are totally unsupported by the record. For instance, appellant argues that Merrill Lynch is liable to him because of Runnigen's failure to properly execute his order on July 29, 1980. This is certainly true. However, the record clearly shows that the profit of $14,134.00 resulting from the delay of two days in executing his order to buy was immediately placed in his account. Clearly, those actions do not violate the Act.
Appellant further argues that the July 31, 1980 correction of the error constitutes unauthorized trading in violation of the act both as to his four contracts, and the cancellation of the four additional contracts. In regard to the liquidation of his position, however, the trade of July 31, 1980 was certainly authorized and was merely a delayed execution of his July 29, 1980 order. Certainly any loss sustained by appellant would have been borne by Merrill Lynch, just as the unexpected profits were credited to appellant. As to the four additional contracts, appellant had no interest in them whatsoever and Merrill Lynch was under no legal or industry-imposed obligation to obtain appellant's permission to liquidate those contracts.
Appellant also claims that Merrill Lynch has willfully failed to disclose that his account was holding eight gold contracts prior to rectification of the error. This position is totally contradicted by the record. Although Runnigen did not know the exact reason for the error on July 30, 1980 when he spoke to appellant on the telephone, he nonetheless disclosed to him that the local billings which Runnigen had received indicated that on July 29, 1980 he had sold four additional contracts instead of buying four to liquidate appellant's position. In addition, the trade confirmation which was mailed to appellant for the July 29, 1980 transaction and the monthly statement for July 31, 1980 reported the trades to appellant. Even if Runnigen had disclosed on the telephone exactly what had occurred, it would not have mattered because appellant had no ownership interest in the $15,600.00 profit as he was not a party to those transactions.
Thus, appellant was apprised of the error both in his account statements and with his conversations with Runnigen. The trial court's conclusion that no violations of the Commodity Exchange Act occurred is correct.

ASSIGNMENT OF ERROR NUMBERS 3 and 4.
Appellant argues that he should have been afforded an opportunity to "ratify" the sale of the four additional contracts and the failure to provide this opportunity was a breach of fiduciary duty owed to appellant. Appellant has failed to provide any legal authority in support of this contention. Since we have already determined that appellant had no ownership interest in the four additional contracts, it logically follows that there was no breach of fiduciary duty when those contracts were liquidated to correct the error. Likewise, there was no duty to inform appellant of the error so as to give him an opportunity to ratify the erroneous trade on the four additional contracts.
The error in the instant case occurred when an erroneous order was communicated to the floor of the exchange. Merrill Lynch was the principal in this phase of the transaction, and the order for the sale of the additional four contracts was not entered into by Merrill Lynch as agent for appellant. He (appellant) never *1346 contracted with Merrill Lynch for their sale. Merrill Lynch alone was exposed to the market risk on these contracts. Therefore, since Merrill Lynch was not holding the contracts as agent for appellant, the agency principles of accounting for the profits simply do not apply.
Finally, appellant contends that because he was denied the opportunity to keep the four additional contracts he sustained a loss of $308,080.00 representing lost profits on all eight contracts. This claim was correctly dismissed by the trial court as too speculative.
Calculation of these damages is based upon the assumption that appellant, if he had been given the opportunity to keep all eight contracts, would have held them until their delivery date.
The purely speculative nature of the claim is best demonstrated by the testimony of Runnigen which shows that market moves in September, 1980 would have resulted in an unrealized loss to appellant on the eight contracts of approximately $136,000.00 during that one month period. This, coupled with the fact that appellant had directed liquidation of his four gold contracts when he was facing a minimal loss of $1,500.00 indicated it was more probable than not that he would not have chosen to weather the adverse market until the delivery date of February, 1982. Accordingly, the dismissal of the lost profits' claim is correct.

ASSIGNMENT OF ERROR NUMBER 6.
Appellant claims he is entitled to interest and attorney fees because of alleged violations of La.R.S. 51:701, et seq., commonly referred to as Louisiana Blue Sky Law. We find no merit in this argument. Appellant has failed to prove any violation of said statute, and furthermore we are satisfied that a commodity futures contract is not governed by that statute. Louisiana's Blue Sky Laws were patterned after the Federal Act of 1933, and commodity futures contracts are not "securities" within the federal regulatory scheme. See, Moody v. Bache & Co. Inc., 570 F.2d 523 (5th Cir.1978); Chipser v. Kohlmeyer, 600 F.2d 1061 (5th Cir.1979).
Accordingly the judgment of the lower court is affirmed.
AFFIRMED.