525 So.2d 1157 (1988)
CYPRESS OILFIELD CONTRACTORS, INC., et al., Plaintiffs-Appellees,
v.
McGOLDRICK OIL COMPANY, INC., et al., Defendants-Appellants.
No. 87-365.
Court of Appeal of Louisiana, Third Circuit.
May 11, 1988.
*1159 John Boatner, Bunkie, for plaintiffs-appellees.
Daryl J. Hebert, Hank S. Hannah, Eunice, for defendants-appellants.
Before STOKER, DOUCET, and YELVERTON, JJ.
DOUCET, Judge.
Third-party defendant, First Acadiana Bank (FAB), appeals from a judgment rendered against it and in favor of third-party plaintiff, McGoldrick Oil Company (McGoldrick).
In January 1985, McGoldrick entered into an oral agreement with GDL Construction Company (GDL) pursuant to which GDL agreed to perform repair work on a bridge. The bridge traversed a small canal and connected two links of a private road accessing an oilfield operated by McGoldrick. Another company, Bradex Oil and Gas, also used the bridge and agreed to pay one-half of the cost of the work. The work on the bridge was completed later that same month and McGoldrick received a bill from GDL for its share of the cost of the work, $8,496.97. McGoldrick was instructed by GDL to "hold up" payment of the bill and, one month later, McGoldrick received a notice of assignment from FAB notifying it that GDL had assigned McGoldrick's account to FAB. A cover letter purportedly assured McGoldrick that GDL was financially sound and directed it to remit payment on the invoice to FAB. Within two days, on March 14, 1985, McGoldrick sent FAB a check for the full amount owed GDL.
GDL had subcontracted out most of the bridge work to Cypress Oilfield Contractors, Inc. (Cypress), with materials being furnished by Offshore Lumber and Supply Company, Inc. (Offshore). GDL failed to pay Cypress or Offshore and filed for bankruptcy on March 21, 1985. Cypress and Offshore subsequently instituted this suit against McGoldrick asserting their privilege provided by La.R.S. 9:4861. McGoldrick filed the third-party demand, which is the subject of this appeal, against FAB claiming that an officer of FAB negligently misrepresented to it that GDL was financially stable. Pursuant to a judgment on the main demand, McGoldrick paid the amounts due Cypress and Offshore. On the third-party demand the trial court found that FAB negligently misrepresented that GDL was financially stable and that McGoldrick relied on that representation to its detriment in paying to FAB the amount due GDL, thus incurring double liability.
At trial of the matter, Bryan W. Hardy, chief accountant or comptroller of McGoldrick, testified. Hardy is responsible for, among other things, accounts payable. On February 6, 1985, after the bridge work was completed, he received an invoice from GDL for $8,496.97. Payment ordinarily would have been made on the 12th of the month. Before then, however, he received a telephone call from GDL requesting McGoldrick to "hold up" on payment of the bill and indicating that payment would probably be made to "the bank." About this time Hardy discovered that GDL had subcontracted out some of the bridge work. Not until the action was instituted by Cypress and Offshore did he learn that "90%" of the work had been subcontracted. He subsequently received a letter from FAB, dated March 12, 1985, together with a notice that GDL had assigned McGoldrick's account to FAB. The cover letter informed McGoldrick that the attached invoice had been assigned to FAB as collateral for an operational line of credit for GDL. The letter further stated:
"The pledging of invoices is a common business practice and in no way implies that the firm is experiencing financial difficulties. It is done strictly to provide cash flow assistance.

*1160 ....
Again, the financial stability of our customer is not in jeopardy and this is merely a financing agreement to provide them with operating capital. Your cooperation is appreciated, but do not hesitate to call the undersigned should any questions arise."
After receiving the call from GDL instructing him to "hold up" paying the invoice, and discovering there was both a third-party subcontractor and supplier, Hardy began to have some doubts regarding the financial stability of GDL. However, based upon the assurances of GDL's financial stability contained in the letter from FAB, Hardy remitted payment in full, $8,496.97, to FAB. This check, written on McGoldrick's account, is dated March 14, 1985, which was either the day or the day after he received the letter and notice of assignment from FAB. Hardy admitted that he did not make any further inquiries of anyone at FAB about GDL's financial stability nor did anyone at McGoldrick conduct a general investigation into GDL's solvency. Hardy stated, "I assumed a financial study had been done ..." by FAB. He also stated that before he received the letter from FAB he had intended to conduct some sort of investigation before paying GDL. He mentioned that McGoldrick doesn't normally like to do business with companies that have to assign their accounts receivable because he feels that is an indication the company is "not solid." Generally, he stated, it is the responsibility of the production superintendent to secure contractors for work such as the bridge work and to check them out. Upon learning that third-parties were involved he stated that he would usually question the superintendent regarding the financial stability of the contractor but admitted he failed to do so in this case.
Arlon Reed was an assistant to the manager of McGoldrick. He confirmed most of Hardy's testimony stating that if they had not received the letter from FAB, McGoldrick would have paid Cypress & Offshore directly. McGoldrick had directly paid subcontractors in the past, he stated.
Leelen R. Lavergne was a vice-president of FAB. He came to work for the bank in April 1984, and took over the servicing of GDL's loans. GDL had a line of credit from the bank to fund different construction projects. GDL would secure a contract and present FAB with invoices, assigning these accounts receivable to FAB. Pursuant to La.R.S. 9:3107 FAB would notify the debtors on these accounts of the assignments. Lavergne admitted that prior to sending the letter he had not actually made an investigation into the financial condition of GDL. The statement he testified, was "essentially" based upon GDL being current with payments to FAB at the time the letter was sent. Lavergne admitted that in February 1985, FAB turned down an application by GDL to increase its line of credit. Later, however, he stated that he could not recall the date or, apparently, even the month or year of this denial. Lavergne testified that a check dated March 14, 1985 for $8,496.97 was deposited in an escrow account under the name of GDL. Referring to the escrow account he stated, "Apparently we found out he [GDL's owner] was in financial trouble after we loaned him the money. That's why we put it into escrow."
The deposition of Charles N. Wooten, Sr., an attorney who represented GDL in bankruptcy proceedings, is contained in the record. At the outset of the deposition it was stipulated by both counsel for McGoldrick and for FAB that Wooten was an expert in the field of bankruptcy practice. Wooten stated that sometime in late 1984, Glenn Laughlin, the president and sole stockholder of GDL, conferred with him regarding his personnel and business-related (GDL) financial difficulties. Wooten saw him on maybe two occasions in late 1984. On March 21, 1985, Wooten filed a petition on behalf of GDL in the U.S. Bankruptcy Court for the Western District of Louisiana seeking liquidation under Chapter 7. Wooten recommended to Laughlin that he liquidate GDL rather than attempt to reorganize because his personal and business financial condition was so bad that he could not have rehabilitated the business. Wooten opined that Laughlin's, and *1161 GDL's, financial condition as of March 12, 1985, the date of FAB's letter to McGoldrick, was no different than on March 21, 1985, when the petition for bankruptcy was filed. Neither did Wooten feel there had been any substantial difference in Laughlin's or GDL's financial condition in late 1984 as compared with March 1985.
Based upon this evidence the trial court found that FAB negligently misrepresented GDL's financial stability to McGoldrick who suffered a loss because of its negligence. He awarded McGoldrick $8,496.97, the amount it paid to GDL through its account assigned to FAB. On appeal, FAB claims that the trial court erred in finding that FAB owed McGoldrick any type of fiduciary duty and in failing to find that McGoldrick caused or, alternatively, contributed to its own damages.
To determine the liability of FAB we will employ the familiar duty-risk analysis.
"The following questions are considered in this analysis:
(1) Was the conduct in question a cause-in-fact of the resulting harm?
(2) Was there a duty owed by the defendant to protect the plaintiff from this type of harm arising in this manner?
(3) Did the defendant violate the duty owed?
See Mart v. Hill, 505 So.2d 1120 (La. 1987); Hill v. Lundin and Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Crowe, The Anatomy of a Tort, 22 Loy. L.Rev. 903 (1976); McNamara, The Duties and Risks of the Duty-Risk Analysis, 44 La.L.Rev. 1227 (1984)."
Whether or not FAB's conduct was a cause-in-fact of the harm suffered by McGoldrick is a question of fact to be determined by the trial court. Its finding of fact will not be disturbed on appellate review unless (1) the record evidence does not furnish a basis for the finding, or, (2) the record evidence furnishes a reasonable basis for the finding but nonetheless that finding is clearly wrong. Virgil v. American Guarantee and Liability Insurance Company, 507 So.2d 825 (La.1987); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978); Canter v. Koehring Company, 283 So.2d 716 (La.1973). FAB's conduct will be considered a cause-in-fact of McGoldrick's harm if it in any way contributed to it. See Crowe, The Anatomy of a Tort, supra.
It appears that GDL assigned McGoldrick's account to FAB pursuant to La.R.S. 9:3102(B). Such an "assignment" is not a sale wherein title is transferred but instead, constitutes a pledge of the account receivable and gave the pledgee-assignee, FAB, a security interest in the proceeds of the account. As a general rule all defenses the debtor has available to him against the assignor are likewise available against the assignee. Herlitz Construction Co., Inc. v. Matherne, 476 So.2d 1037 (La.App. 3rd Cir.1985). This general rule applies to the facts of the case at bar where the "assignment" merely gives the assignor a security interest under La. R.S. 9:3102(B).
The uncontradicted testimony of Hardy and Reed, employees of McGoldrick, was that McGoldrick relied on the assurance by FAB and its officer, Lavergne, that the "financial stability" of GDL was "not in jeopardy." As a result McGoldrick did not inquire further into GDL's financial condition but promptly remitted payment in full to GDL in care of FAB. Later, McGoldrick was sued and found liable to Cypress and Offshore. McGoldrick incurred double liability for the bridge work when, had it investigated and discovered GDL's insolvency, it could have taken adequate measures to protect its interests. The trial court found that FAB's conduct was a cause-in-fact of McGoldrick's harm and we find the record evidence furnishes a reasonable basis for the finding which we are unable to say was clearly wrong.
Whether or not a duty exists is a question of law. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984). La.C.C. art. 2315 states in part:
"Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."
La.C.C. art. 2316 states:
"Every person is responsible for the damage he occasions not merely by his *1162 act, but by his negligence, his imprudence, or his want of skill."
These articles encompass a cause of action for negligent misrepresentation. Devore v. Hobart Manufacturing Company, 367 So. 2d 836 (La.1979); Dohmann v. United Gas Pipeline, 457 So.2d 307 (La.App. 3rd Cir. 1984); Beal v. Lomas and Nettleton Co., 410 So.2d 318 (La.App. 4th Cir.1982). In order for the doctrine to apply three circumstances must concur: (1) there must be a legal duty on the part of the defendant to supply correct information; (2) there must be a breach of that duty; and (3) the breach must have caused damages to the plaintiff. Dohmann v. United Gas Pipeline, supra; Beal v. Lomas and Nettleton Co., supra. These factors are simply the core of the duty-risk analysis.
FAB argues that there was no duty on its part to supply correct information to McGoldrick regarding the financial stability of GDL. It asserts that Louisiana courts have not recognized a general fiduciary duty owed by banks to non-customers and that McGoldrick seeks to extend the present theory of negligent misrepresentation. It is true that most of the Louisiana cases in which appellate courts have upheld awards based upon a theory of negligent misrepresentation have involved existing fiduciary-type relationships between the plaintiff and defendant. See Dohmann v. United Gas Pipeline, supra: credit union-member; Beal v. Lomas and Nettleton Co., supra: insurer-insured.
In the case at bar McGoldrick apparently had no previous dealings with FAB. The sole nexus between the two parties at the time the letter was written was McGoldrick's obligation on a contract invoice assignedpledged to FAB. FAB owed no duty to McGoldrick to furnish it any information regarding GDL's financial condition. However, when FAB stated clearly that the financial stability of GDL was not in jeopardy it assumed a duty to insure that the information volunteered was correct. FAB assured a third party with whom it was dealing that one of its commercial customers to whom it had extended credit was financially stable when it was actually insolvent. To allow a financial institution to make such a misrepresentation and not hold it responsible for the resulting harm would be to ignore basic principles of law contained in our civil code.
The duty assumed by FAB to insure that such information volunteered was correct encompassed the risk that McGoldrick would rely on the misrepresentation and suffer the damages it sustainedpaying the insolvent contractor through its assignee/pledgee and subjecting it to double liability. FAB breached that duty and we are unable to find error in the trial court's finding of liability on the part of FAB under a theory of negligent misrepresentation.
FAB next asserts that the trial court erred in not finding that McGoldrick was contributorily negligent. Contributory negligence is an affirmative defense which must be set forth in the defendant's answer. La.C.C.P. art. 1005. FAB failed to set forth the defense on its answer. However, where an affirmative defense has not been pleaded but the opposing party nevertheless fails to object to the introduction of evidence bearing on the affirmative defense and which is not relevant to other issues raised in the pleadings, the pleadings are considered to have been enlarged to include the affirmative defense. La. C.C.P. art. 1154; DLJ of Louisiana No. 1 v. Green Thumb, Inc., 376 So.2d 121 (La. 1979). Much evidence was presented at trial of this matter which was directed to the issue of McGoldrick's contributory negligence. In its pre-trial memorandum counsel for FAB also clearly set forth its claim that McGoldrick was contributorily negligent and at trial counsel directed his cross-examinations of Hardy and Reed towards establishing that fact.
The trial judge did not address the issue of plaintiff's contributory negligence or comparative fault. Such silence on the part of the trial court is considered a rejection of that defense. See Hatcher v. State, Dept. of Transportation and Development, 478 So.2d 774 (La.App. 3rd Cir. 1985), writ denied, 479 So.2d 923 (La.1985); Reed v. Seacoast Products, Inc., 458 So.2d *1163 971 (La.App. 3rd Cir.1984). Contributory negligence is that conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection. Fusilier v. Northbrook Excess & Surplus Insurance Company, 471 So.2d 761 (La.App. 3rd Cir.1985), writ denied, 472 So.2d 918 (La.1985); Harris v. Pineset, 499 So.2d 499 (La.App. 2nd Cir.1986), writ denied, 502 So.2d 114 and 502 So.2d 117 (La. 1987). Contributory negligence is a question of fact which the party relying on has the burden of establishing. Fusilier, supra; Simmons v. Beauregard Parish School Board, 315 So.2d 883 (La.App. 3rd Cir.1985), writ denied, 320 So.2d 207 (La. 1975).
Employing the duty-risk analysis we first examine whether conduct on the part of McGoldrick was a cause-in-fact of its damages. McGoldrick was an established oil-related business which had dealt with contractors and subcontractors on prior occasions. La. R.S. 9:4861 gives to "any person" who performs essentially any labor or who provides any services or supplies in connection with the drilling or operation of oil, gas or water wells a privilege. The use of subcontractors is common in the industry. Hardy and Reed admittedly were put on notice that something was amiss and intended to look into the finances of GDL. They also knew that GDL had subcontracted at least some of the bridge work out. Had they inquired of McGoldrick's own employee who personally contracted with GDL, they would have learned the extent to which the work had been subcontracted. Had McGoldrick simply contacted the subcontractors, it would have discovered these companies had not been paid and it could have taken appropriate measures to protect its interests. The failure to inquire into this matter was a cause-in-fact of their damages. Any other finding would not be supported by the evidence.
Certainly, in light of the facts known to it, McGoldrick had a duty to make at least an inquiry into whether Cypress and Oilfield had been paid by GDL. McGoldrick failed to act as an ordinary and prudent business entity would have under similar circumstances and chose to blindly rely on the letter from FAB. We find that McGoldrick was contributorily negligent. A finding to the contrary is not supported by the evidence.
La.C.C. art. 2323 provides:
"When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss."
In Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La. 1985) the Louisiana Supreme Court set forth guidelines for applying the mandate of La. C.C. art. 2323, stating:
"We recognize that a standard for determining percentages of fault has not been provided by the Legislature, and we are therefore presented with an opportunity to offer guidelines as we apportion fault in this instance. In so doing we have looked to the Uniform Comparative Fault Act, 2(b) and Comment (as revised in 1979), which incorporates direction for the trier of fact. Section 2(b) provides:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced *1164 by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties." (footnotes omitted)
The actions of McGoldrick substantially contributed to its own damages. The letter from FAB, we feel, contributed somewhat more so. A business concern such as McGoldrick cannot blindly ignore facts apparent to it or fail to make a minimal inquiry which would have most probably prevented this sequence of events. Nor can a banking institution blindly represent the financial stability of its commercial customer in a notice of assignment of accounts receivable sent to one of that customer's debtors. McGoldrick knew or should have known of the danger in paying a contractor, knowing there were subcontractors, when it suspected the contractor may have had financial problems. The risk created was that presented by the facts of this case. FAB knew or should have known that McGoldrick might rely on its representation of GDL's financial stability in paying on the account. Why else would FAB have sent a letter containing such an assurance. Of course, it could have assumed that McGoldrick knew the company it dealt with and would not rely on the representation if it suspected any financial problems. Then again, if a lending institution doesn't know the financial stability of its commercial borrowers, who does? All factors considered we apportion fault 70% to First Acadiana Bank and 30% to McGoldrick Oil Company.
For the reasons assigned, we affirm the judgment of the trial court in part, amend it in part, and recast it to read as follows:
IT IS ORDERED, ADJUDGED, AND DECREED that there be and hereby is judgment in favor of Plaintiff, McGOLDRICK OIL COMPANY and against Defendant, FIRST ACADIANA BANK in the amount of FIVE THOUSAND, NINE HUNDRED FORTY-SEVEN and 88/100 ($5,947.88) DOLLARS, together with legal interest thereon from the date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all costs of court at both the trial and appellate levels be assessed 70% against Defendant, FIRST ACADIANA BANK, and 30% against Plaintiff, McGOLDRICK OIL COMPANY.
AFFIRMED IN PART; AMENDED, AND AS AMENDED, AFFIRMED.