Robert J. **GUIDRY**, Plaintiff–Appellant,

v.

**BANK OF LaPLACE, etc., et al., Defendants–Appellees.**

No. 90–3428.

United States Court of Appeals,
Fifth Circuit.

Feb. 25, 1992.

Arthur A. Lemann, Lemann, O'Hara & Miles, New Orleans, La., for Robert J. Guidry.

Byron Franklin Martin, III, McGlinchey & Stafford, New Orleans, La., for Bank of LaPlace, Patrick Guidry.

Thomas K. Potter, III, R. Patrick Vance, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for FNBC.

Before POLITZ, Chief Judge, JOHNSON and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellant Robert J. Guidry (Guidry) appeals the dismissal on the pleadings of his complaint alleging various counts of racketeering, fraud, and negligence. 740 F.Supp. 1208. Guidry's injury stems from his unwitting participation in a criminal "Ponzi"[1] and check kiting scheme masterminded by Lynn Paul Martin (Martin). Martin, not a defendant in this action, pleaded guilty to criminal charges stemming from this scheme and is currently serving a fifteen-year prison sentence. The defendants-appellees in this matter are: the Bank of LaPlace (BOL), where Martin kept a bank account through which he administered the Ponzi scheme; Patrick Guidry (P. Guidry), a director of BOL; and the First National Bank of Commerce (FNBC), a bank that provided check-clearing services to BOL and at which Guidry had an account during a portion of the twenty months that he was involved with Martin.

Guidry's complaint alleges violations of two sections of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, and several violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, (the 1934 Act), and Rule 10b–5 promulgated thereunder, and sections 12(1) and 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(1) & (2), (the 1933 Act). All these federal claims were dismissed with prejudice for failure to

---

1. Ponzi was the last name of the swindler in *Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924). The term has come to be used to describe a scheme whereby the swindler uses money from later victims to pay earlier victims.

state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure (Fed. R.Civ.P.).

Guidry's complaint also alleges several Louisiana state law claims over which the district court exercised pendent jurisdiction. The district court dismissed with prejudice Guidry's state securities law and negligence claims on Rule 12(b)(6) grounds and dismissed with prejudice Guidry's allegations of fraud on the ground that Guidry failed to state those claims with particularity as required by Fed.R.Civ.P. Rule 9(b).

Guidry appeals the dismissal of all claims and, alternatively, argues that if the district court did correctly dismiss the federal claims, it should have dismissed the state law claims *without* prejudice for lack of jurisdiction.

## I. The Facts

We review *de novo* a district court's dismissal on the pleadings. *Walker v. South Central Bell Telephone Co.,* 904 F.2d 275 (5th Cir.1990). We accept the complaint's well-pleaded factual allegations as true. *O'Quinn v. Manuel,* 773 F.2d 605 (5th Cir.1985). However, "[i]n order to avoid dismissal for failure to state a claim, a plaintiff must plead specific facts, not mere conclusory allegations...." *Elliott v. Foufas,* 867 F.2d 877, 881 (5th Cir.1989). And, "[c]onclusory allegations and unwarranted deductions of fact are not admitted as true" by a motion to dismiss. *Associated Builders, Inc. v. Alabama Power Company,* 505 F.2d 97, 100 (5th Cir.1974). Therefore, in deciding whether Guidry's complaint sufficiently states any claims against the defendants, we must set forth the facts well-pleaded by the complaint (including the RICO Case statement, filed by Guidry below in accordance with the local

rules, and Guidry's first supplemental and amending complaint).

In 1982, Martin began a scheme in which he convinced his victims to provide him with funds he would use to purchase large blocks of airline tickets for groups taking gambling trips to Las Vegas. Martin told his victims that certain Las Vegas hotels would reimburse him for the tickets and pay him a commission. Each victim gave Martin a check to provide Martin funds to purchase the tickets, and in return Martin gave each victim two checks, both post-dated one month later. One check was for the amount of the victim's check, and the other represented the victim's return on that amount.[2]

The airline tickets and arrangements with the Las Vegas hotels were fictitious. Martin kept his scheme alive by using checks from later victims to honor the checks given to his earlier victims.

Guidry wrote his first check to Martin on August 28, 1986, on the advice of an individual named Martinez.[3] Over the next 20 months, Guidry engaged in approximately 331 similar transactions with Martin representing a total of over $170,000,000 advanced by Guidry to Martin.[4] In April 1988, Martin's scheme finally collapsed and Guidry was left holding worthless checks from Martin for over $12,000,000, roughly $7,000,000 of which was reinvested returns on earlier Guidry checks to Martin; Guidry sustained a net loss in his relationship with Martin of approximately $5,500,000.

By the time Guidry began dealing with Martin, Martin was conducting his scheme through LPM Enterprises (LPM), an unincorporated sole proprietorship that was merely an alter ego of or name for Martin himself. The BOL checking account was in LPM's name.

---

**2.** The returns ranged between four and seven percent per month for various contributions, but each individual return was for a specific and non-variable amount, as represented by the second post-dated check.

**3.** Martinez is named but not otherwise identified in the pleadings. He is identified as an FNBC officer by Guidry in his brief on appeal.

**4.** In some instances, Guidry would tear up a check from Martin that had come due, and in return would receive from Martin two more post-dated checks. Also, Martin on a few occasions gave Guidry one, rather than two, post-dated checks representing both repayment of principle and the agreed return. The basic character of the transactions did not vary, however.

FNBC solicited Guidry as a bank customer from June 1986 through mid-December 1986 offering Guidry, among its other services, that of "investment expertise." Also, according to the complaint, FNBC officers "expressed [an] awareness as to the legitimacy of the investment contract gained from prior dealings with Martin and investors." For the first some thirteen months of his participation in Martin's scheme, the checks written by Guidry to Martin were not drawn on FNBC (or BOL); however, thereafter Guidry commenced writing his checks to Martin on a checking account Guidry had opened at FNBC, because FNBC permitted Guidry to draw on uncollected Martin checks.

According to Guidry, in addition to the instances already set forth, the defendants participated in the scheme in the following ways:

BOL and P. Guidry aided and abetted Martin by:

(i) Permitting Martin to operate the scheme out of a BOL checking account;

(ii) Leading investors to believe that Martin was operating a legitimate business;

(iii) Permitting Martin to overdraw his checking account on a regular basis and in substantial amounts;

(iv) Manipulating Martin's checking account to extend the life span of the scheme;

(v) Concealing the scheme or, alternatively, consciously avoiding discovery of the scheme.

Additionally, P. Guidry "advised" Guidry and led him to believe that Martin's scheme was legitimate at various times throughout Guidry's relationship with Martin.

FNBC aided and abetted Martin by:

(i) Advising Guidry to participate in Martin's scheme though it knew that the scheme was fraudulent;

(ii) Using its relationship with BOL (provision of check-clearing services) to further the scheme;

(iii) Concealing the scheme or, alternatively, consciously avoiding discovery of the scheme.

Further, sometime in July 1987, officers of FNBC met with Guidry and "advised" him as to his participation in Martin's scheme.

Additionally, at various times throughout Guidry's relationship with Martin, Martinez continued to express his awareness and opinions, and supply information as to the legitimacy of Martin's operation. Finally, on or about April 26, 1988, after Martin had confessed the scheme to the FBI, Martinez told Guidry that FNBC had always known that Martin's scheme was fraudulent.

## II. The Federal Law Claims

### A. The RICO Claims

The district court dismissed the RICO claims against the defendants on the ground that Guidry failed in his complaint to sufficiently allege an "enterprise" as defined by 18 U.S.C. § 1961(4) and used in 18 U.S.C. § 1962(c). Guidry, in his complaint, alleged that:

"From on or about June 1, 1982 and continuously thereafter, up to and including April, 1988, ... a bank account in the name of Martin, Special Account at BOL, and LPM constituted an enterprise ... for the purpose of perpetrating a 'Ponzi' and check kiting scheme through the commission of various criminal acts...."

Section 1961(4) defines an "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[.]"

Apparently, the district court assumed that the phrase "a bank account in the name of Martin, Special Account at BOL, and LPM" referred to a bank account with two names assigned to it (Martin's and LPM's) rather than a bank account (in Martin's name) and an unincorporated proprietorship (LPM). In assuming the former interpretation, the district court found that "the question is whether a bank account is a valid RICO enterprise."

## 1. Bank accounts as enterprises

■ In defining the contours of section 1961(4)'s definition of "enterprise," the Fifth Circuit has preferred an "animate/inanimate object" test. Thus, in this Circuit, "inanimate objects, such as coffee, or intangible rights, such as contract rights, cannot possibly constitute a RICO 'enterprise,' which must be either an individual or a 'legal entity,' such as a corporation, or an association of 'individuals.'" *Old Time Enterprises v. International Coffee Corp.*, 862 F.2d 1213, 1218 (5th Cir.1989). *See also Elliott*, 867 F.2d at 881.

A bank account is a debt that a bank owes to the depositor. Thus, it is closely analogous to the "intangible rights, such as contract rights" spoken of in *Old Time Enterprises* and is not analogous to a legal entity such as a corporation or to an association of individuals, and therefore cannot constitute an "enterprise" under RICO. *Accord In re Catanella* and *E.F. Hutton & Co. Securities Litigation*, 583 F.Supp. 1388, 1426 (E.D.Pa.1984) ("No conceivable reading of the statutory definition would support a conclusion that securities accounts qualify as 'enterprises'").

## 2. LPM Enterprises as an enterprise

■ Alternatively, interpreting Guidry's statement of enterprise in the complaint as a bank account *and* an unincorporated sole proprietorship—a strained interpretation at best—would raise a different issue as to the legal sufficiency of Guidry's claim. A sole proprietorship, unlike a bank account, does qualify as an individual (or, in appropriate circumstances, as a group of individuals associated in fact) and therefore as an "enterprise" under section 1961(4). *See McCullough v. Suter*, 757 F.2d 142, 143 (7th Cir.1985).

■ The thornier problem, however, is presented by analyzing the "enterprise" through section 1962(c), which gives rise to a requirement that the RICO "person" be distinct from the RICO "enterprise." Section 1962(c) applies to "any person *employed by* or *associated with* any enterprise" and thus strongly implies such a distinction. (Emphasis added). *See McCullough, supra; United States v. Benny*, 786 F.2d 1410, 1416 (9th Cir.1986). This Court has expressly adopted the "distinction" requirement in our interpretation of section 1962(c). *Bishop v. Corbitt Marine Ways, Inc.*, 802 F.2d 122, 123 (5th Cir.1986); *see also Landry v. Air Line Pilots Ass'n Internat'l AFL–CIO*, 901 F.2d 404 (5th Cir.1990).

■ The rule to which we subscribe was articulated in the *McCullough* opinion. Though the proprietorship in question in that case had several employees, thus sustaining the conclusion that the proprietor could associate with the proprietorship, the court did recognize that:

> "There would be a problem if the sole proprietorship were strictly a one-man show. If [the proprietorship] had no employees or other associates and simply did business under the name of [the proprietorship], it could hardly be said that [the proprietor] was associating with an enterprise ...; you cannot associate with yourself, any more than you can conspire with yourself, just by giving yourself a *nom de guerre.*" *McCullough, supra,* at 144.

The present case falls directly into this logical exception. LPM is merely a name under which Martin did business for the purposes of carrying out his scheme. Therefore, the RICO "person" and "enterprise" are one and the same, and Guidry's complaint fails the distinction test adopted by this Circuit.[5]

---

**5.** In rebuttal, Guidry now argues that as the defendants (and RICO "persons") are two banks and a director, they, therefore, are distinct from the RICO "enterprise," LPM (Martin).

This argument, however, is made for the first time on appeal and is not a reasonable interpretation of Guidry's pleadings. The complaint names the defendants as aiders and abettors and conspirators at various points, but never as perpetrators. Guidry's RICO Statement filed below plainly refers to the defendants as only aiding and abetting Martin in his scheme. And finally, Guidry made it clear in his below-filed opposition to the defendants' motions to dismiss that Guidry intended that the complaint allege the defendants "to be liable as aiders and abettors *rather than as actual perpetrators.*" As Martin could not be a principal violator of sec-

## B. The Federal Securities Law Claims

■ This Court, in the unpublished *per curiam* decision of *Reeder v. Succession of Palmer*, 917 F.2d 560 (5th Cir.1990) (unpublished), decided in the case of another plaintiff injured by Martin's Ponzi and check kiting scheme that no "security," as defined by the 1933 Act and the 1934 Act (15 U.S.C. §§ 77b(1), 78c(a)(10)), existed in the Martin scheme. Therefore, the plaintiff's complaint failed to state a claim under the federal securities laws. The district court's analysis in that case, adopted in this Court's *per curiam*, is binding on this panel and we follow it today.

In an attempt to distinguish *Reeder*, Guidry argues that while the checks themselves may not be securities, they are evidence of an oral investment contract between Guidry and Martin that does constitute a "security" under the 1933 Act and the 1934 Act.

"Investment contract" is one of the list of enumerated categories of securities to which the 1933 Act and the 1934 Act apply. *See* 15 U.S.C. §§ 77b(1), 78c(a)(10). In *SEC v. W.J. Howey, Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court included an expectation of profits as one of the elements necessary to establish an investment contract. The Supreme Court further defined "profits" as "either capital appreciation resulting from the development of the initial investment ... or a participation in earnings resulting from the use of the investors' funds...." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975).

■ Expectation of profit carries with it a connotation of potential appreciation or depreciation in value of the investment contract. That is, the arrangement must be so structured as to contemplate, at the outset, some risk—either that the investor could lose his investment, or that the value of his return could fluctuate. Neither of these risks are present in the oral contract between Guidry and Martin. Each time Guidry gave Martin a check, Guidry received from Martin two post-dated Martin checks, one in the amount of Guidry's check and the other constituting Guidry's compensation or profit for advancing the amount of his check. Guidry stood to recover no more nor less as a result of his check to Martin, and in each case the Martin checks were payable on a specified date (the dates were all within approximately thirty days of the date of Guidry's check to which they related).

Similarly, the post-dated checks were Martin's legally binding and fully enforceable agreement to pay the amount of the checks on the date they bore. Guidry implies that Martin and Guidry recognized a risk that the checks would be dishonored if Martin's venture was unsuccessful. There is no allegation, however, that Martin and Guidry agreed that Martin would not be liable to Guidry on Martin's checks in any circumstances. There was thus no legal way that Martin could force Guidry to accept less than the amount stated on the post-dated checks in satisfaction of the alleged contract between them. Accordingly, the oral agreement between Martin and Guidry fails the "expectation of profit" prong of the *Howey* test for an investment contract. *Accord United American Bank of Nashville v. Gunter*, 620 F.2d 1108, 1118 (5th Cir.1980). Indeed the transaction is much more like a draft or note, a possibility already analyzed and rejected by the *Reeder* decision, *supra*. *See also* 15 U.S.C. § 78c(a)(10) (note or draft with less than nine-month maturity not a security); 15 U.S.C. § 77c(a)(3) (note or draft with less than nine-month maturity exempted from 1933 Act). We further conclude that the district court correctly determined that if the "family resemblance" test of *Reves v. Ernst & Young*, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990), were applied, Mar-

tion 1962(c) with respect to the "enterprise" LPM (nothing more than a *nom de guerre* of Martin alone), there can be no aiding and abetting any such "violation" by him. *See, e.g., Edwards v. United States,* 286 F.2d 681, 683 (5th Cir.1960) ("'... an aider and abettor may not be guilty in aiding or abetting a principal unless a principal did as a matter of fact commit a crime'"); *United States v. Barfield,* 447 F.2d 85, 89 (5th Cir.1971).

tin's post-dated checks would not be securities.

## III. The State Law Claims

### A. Jurisdiction

Guidry argues that once the district court had dismissed the federal claims that were the basis of its jurisdiction, the court abused its discretion in retaining jurisdiction over the pendent claims and hence erred in dismissing them with, instead of without, prejudice.

■ The power of a district court to adjudicate pendent state law claims after it has disposed of the federal claims that originally invoked its jurisdiction is unquestionable. *Transource Intern'l, Inc. v. Trinity Ind., Inc.*, 725 F.2d 274, 286 (5th Cir.1984); *Breen v. Centex*, 695 F.2d 907, 914 (5th Cir.1983). *See also Hagens v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 1383, 39 L.Ed.2d 577 (1974); *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 1212–14, 25 L.Ed.2d 442 (1970); *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

The Supreme Court in *Gibbs* emphasized that the power of the district court to hear pendent state claims is discretionary. *Id.* 86 S.Ct. at 1139. It also admonished federal courts to refrain from deciding state law claims that are more appropriately decided in state courts. *Id.* Though the Court in *Gibbs* leaned heavily toward *requiring* a district court to dismiss pendent claims when the underlying federal claims had been dismissed, the Court in more recent decisions has backed away from such a position. Instead, district courts are now to decide whether to retain jurisdiction in such cases based on considerations of judicial economy, convenience, fairness, and comity. *See Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988); *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 1213–14, 25 L.Ed.2d 442 (1970). Thus, we must determine whether the district court in this case abused its discretion in rendering final judgment on the merits on the state law claims.

Guidry argues that this Court has held, as a matter of law, that dismissal of federal claims *on the pleadings* requires the district court to forego a determination of the pendent claims for lack of jurisdiction. *See La Porte Const. Co., Inc. v. Bayshore Nat'l Bank*, 805 F.2d 1254 (5th Cir.1986). In *La Porte*, this Court reversed the district court's retention of jurisdiction and dismissal on the merits of pendent state claims after dismissing the plaintiff's RICO claim on the basis of Fed.R.Civ.P. Rule 12(b)(6). Relying on the *Gibbs'* admonition against deciding state law claims, and arguing that due to the preliminary nature of the dismissal judicial economy was not advanced by retention of jurisdiction, this Court held that the district court had abused its discretion in reaching the merits of those claims. *Id.* at 1257.

We find *La Porte* distinguishable on three grounds. First, and most importantly, the plaintiff in that case, unlike Guidry, filed a prompt motion following the judgment of dismissal asking the court to modify its decision and dismiss the state claims for lack of jurisdiction rather than on the merits. The district court denied the motion and the plaintiff then appealed the district court's denial. Here, Guidry raises this contention for the first time on appeal. Guidry made no such motion below following judgment. Nor did he argue, in his opposition to the defendants' motions to dismiss, that if the district court dismissed the federal claims, it should also dismiss the pendent state claims without prejudice for lack of jurisdiction. *See Rubin v. Weinberger*, 524 F.2d 497 (7th Cir.1975) (claim that district court had jurisdiction to hear claim as mandamus action could not be made for the first time on appeal). *Cf. Grubbs v. General Electric Credit Corp.*, 405 U.S. 699, 92 S.Ct. 1344, 1346, 31 L.Ed.2d 612 (1972) (validity of removal procedure followed may not be raised for the first time on appeal); *Lirette v. N.L. Sperry Sun, Inc.*, 820 F.2d 116, 117 (5th Cir. 1987) (en banc) (same).

Second, the defendants-appellees in *La Porte* in their district court memorandum in support of their motion to dismiss the

federal claim had argued that the pendent claims should be tried in state court. *Id.* at 1257. The principle of fairness suggests that once a plaintiff has had a chance to plead his case in district court, has availed himself of the opportunity to argue its sufficiency on the merits, and the district court has rendered a correct decision dismissing the pleadings on the merits, such plaintiff has little right to a second try in state court over the defendant's opposition. Here, unlike the situation in *La Porte*, the defendants have never taken the position that the pendent claims should be resolved in state court if the federal claims were dismissed.

Finally, though the state claims in *La Porte* satisfied the "common nucleus of operative fact" test for pendent jurisdiction, they were not as similar to the federal claim in that case as some of the pendent claims are to the RICO and federal securities claims here. Also, the *La Porte* state law claims were dismissed on statute of limitations grounds, rather than on their merits. *Id.* at 1255. Here, the merits of each issue were fully briefed and argued, despite the early stage of the proceeding. Thus, for *some* issues, as discussed more particularly below, the principle of judicial economy weighs heavily in favor of the district court's disposal on the merits.

### B. The State Securities Law Claims

■ The Louisiana Blue Sky Laws, La. R.S. 51:701 *et seq.*, were patterned after the 1933 Act. *Rogillio v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 448 So.2d 1340, 1346 (La.App.1984). In fact, as Guidry notes, Louisiana's definition of a security "tracks" that of the 1933 Act. Therefore, we find with reasonable certainty that the post-dated checks or any oral agreement that they may evidence as alleged must fail as a cognizable security under Louisiana's Blue Sky Law for exactly the reasons stated above with regard to Guidry's federal securities law claims.

Moreover, a Louisiana Court of Appeals, reviewing other victims' identical counts against Martin for state securities fraud, has relied on the district court's decision in *Reeder v. Succession of Palmer*, 736 F.Supp. 128 (E.D.La.1990), in dismissing those claims.[6] *See Autin v. Martin*, 576 So.2d 72, 73 (La.App.), *writ denied*, 577 So.2d 51 (La.1991); *see also Kuebler v. Martin*, 576 So.2d 75, 77 (La.App.1991), *rev'd in part, writ denied in part*, 578 So.2d 113 (La.1991).

With regard to the Louisiana state securities law claim, the interests of conservation of judicial resources weigh strongly in favor of the district court's decision to dismiss with prejudice. Therefore, we find that the district court did not abuse its discretion with regard to this claim, and we affirm its holding on the merits.

### C. The Negligence Claim

■ The standard of review of the district court's determination of state law is *de novo*. *Salve Regina College v. Russell*, —— U.S. ——, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). The district court dismissed Guidry's negligence claims primarily on the ground that the defendants had no duty to the plaintiff, and the existence of a duty is a question of law under Louisiana jurisprudence. *Harris v. Pizza Hut of Louisiana, Inc.*, 455 So.2d 1364 (La.1984). The requirement of a duty owing is one of the elemental requirements for a claim of negligence under Louisiana law. *Mart v. Hill*, 505 So.2d 1120, 1122 (La.1987); *Pierre v. Allstate Ins. Co.*, 257 La. 471, 242 So.2d 821 (1970).

#### 1. Negligence claims against BOL and P. Guidry

■ The Louisiana Supreme Court has found as a matter of law that under normal circumstances a bank owes no duty to those who are not its customers respecting investigation or disclosure concerning its customers. *See Shreveport Prod. Credit Ass'n v. Bank of Commerce*, 405 So.2d

---

**6.** The district court opinion was adopted by this Circuit in the unpublished *per curiam* of *Reeder v. Succession of Palmer*, 917 F.2d 560 (5th Cir. 1990), that is the primary basis for our dismissal of Guidry's federal securities law claims, *supra.*

842, 845–46 (La.1981). Relying on *Shreveport Production Credit Ass'n*, a Louisiana appellate court found that BOL owed no duty to another of Martin's victims. *See Autin v. Martin*, 576 So.2d 72, 74–75 (La. App.), *writ denied*, 577 So.2d 51 (La.1991).

However, as Guidry correctly points out, circumstances may arise that will cause Louisiana courts to ignore the general rule set out above and find a duty owing by the defendant to the plaintiff. *See Cypress Oilfield Construction v. McGoldrick Oil*, 525 So.2d 1157 (La.App.1988). These circumstances may apply to a claim of negligent misrepresentation, a claim not alleged in *Autin*.

■ Guidry asserts that the following allegations in his complaint state a claim of negligent misrepresentation under *Cypress Oilfield Construction:*

"From on or about September 3, 1986, and at various other times until April 25, 1988, P. Guidry of BOL advised Guidry based upon his knowledge of the legitimacy of the LPM investment contract, and led Guidry to believe that LPM was a legitimate investment."

In *Cypress Oilfield Construction*, a contractor in financial trouble assigned an account receivable to its bank in return for cash. The plaintiff, for whom the contractor was to build a bridge, and who owed the assigned debt, received notice of the assignment instructing the plaintiff to pay the bank, rather than the contractor, the amount due. Together with the notice of assignment, the bank sent a cover letter assuring the plaintiff that the contractor was financially sound. The contractor subsequently filed for bankruptcy, having failed to pay its subcontractors who had done much of the work on the bridge. Under a Louisiana statute, the plaintiff was required to pay the subcontractors, though it had already paid the bank. The Louisiana appeals court affirmed the trial court's ruling that although the bank owed no pre-existing duty to the plaintiff, it assumed a duty by volunteering information on the contractor's solvency. *See Cypress Oilfield Construction*, 525 So.2d at 1159–62.

*Cypress Oilfield Construction* is an exception to the well-established general Louisiana rule that a bank owes no duty to noncustomers. Currently, the allegations in Guidry's complaint are too general and amorphous to allow determination of whether the narrow *Cypress Oilfield Construction* exception applies.

Therefore, as to the allegations of negligent misrepresentation against BOP and P. Guidry, we affirm the district court's dismissal of those claims. However, because it does not clearly appear whether or not Guidry can in good faith allege a valid negligent misrepresentation claim, we modify the district court's ruling with respect to that claim to be a dismissal without (rather than with) prejudice, so Guidry will not be precluded thereby from pursuing his negligent misrepresentation claim against BOL and P. Guidry in Louisiana state court.

As to the other negligence theories advanced by Guidry against BOL and P. Guidry, we conclude that the general presumption of no-duty applies and the district court's judgment is affirmed.

2. Negligence claims against FNBC

■ In *Kuebler v. Martin*, 578 So.2d 113 (La.1991), the Louisiana Supreme Court found that the plaintiff there, another of Martin's victims, had stated a cause of action against a bank *at which he had an account* by alleging that:

(i) an officer of the bank knew of Martin's scheme;

(ii) the bank learned of the scheme through the officer;

(iii) the bank, based on the representations of the officer and without exercising due diligence, encouraged the plaintiff to invest in Martin's scheme; and

(iv) the bank loaned money to the plaintiff for the purposes of investing in Martin's scheme.

Here, Guidry has alleged circumstances (i) through (iii) above, but not (iv). Because there is no clear Louisiana authority that forecloses a duty owing from FNBC to Guidry under these circumstances, we believe the district court acted too hastily in

dismissing those claims on the merits. We therefore reverse the district court's dismissal and remand with instructions that the district court dismiss the FNBC negligence claims without prejudice so that the judgment will not preclude Guidry from refiling these claims in Louisiana state court.

### D. The Fraud Claims.

 The district court dismissed Guidry's claims of state law fraud for noncompliance with Rule 9(b) of the Federal Rules of Civil Procedure, which states, in part: "In all averments of fraud, or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P.Rule 9(b). This higher standard stems from the obvious concerns that general, unsubstantiated charges of fraud can do damage to a defendant's reputation. *Segal v. Gordon,* 467 F.2d 602, 607 (2d Cir.1972).

This Court has recognized the particularity requirement with regard to fraud allegations as "well settled." *Southmark Properties v. Charles House Corp.,* 742 F.2d 862, 877 n. 24 (5th Cir.1984). What constitutes "particularity" will necessarily differ with the facts of each case and hence the Fifth Circuit has never articulated the requirements of Rule 9(b) in great detail. However, this Court has found that the plaintiff must allege with particularity "the defendant's acts which the plaintiff contends amount to fraud." *Unimobil 84, Inc. v. Spurney,* 797 F.2d 214, 217 (5th Cir.1986). *See also Todd v. Oppenheimer,* 78 F.R.D. 415 (S.D.N.Y.1978) (specific requirements of Rule 9(b)).[7]

Guidry's factual allegations are, for the most part, conclusory or vague or both. Even the most specific factual allegations in Guidry's complaint fail to satisfy Rule 9(b)'s requirements. The allegations that P. Guidry advised Guidry and led him to believe that Martin's scheme was legitimate at various times throughout Guidry's relationship with Martin is fully within Guidry's knowledge; yet, these allegations do not state, with any degree of particularity or specificity whatever, the time, place, circumstances, or content of P. Guidry's alleged misrepresentation. Guidry's similar allegations against Martinez (who Guidry's brief in this Court asserts was an FNBC officer) that he advised Guidry to participate in Martin's scheme also are devoid of appropriate specificity and yet should be wholly within Guidry's knowledge.

As the complaint stands, Guidry has charged only that the banks are somehow culpable in Martin's fraud. He has not alleged specific acts or omissions by either bank or their officers that would give rise to such culpability. Therefore, we affirm the district court's dismissal of the fraud charges on the ground that they fail Rule 9(b)'s particularity requirement.

It does not appear, however, that there is no possibility that Guidry could amend his complaint to state a fraud cause of action in state court. Because dismissing Guidry's complaint with prejudice on the ground that his complaint was insufficiently precise seems inappropriate in the circumstances, we modify the district court's order in this respect to be one of dismissal without prejudice, so that the judgment will not preclude his pursuing these claims in state court.

### Conclusion

We hereby modify the district court's judgment insofar only as it dismisses *with* prejudice Guidry's state law claims for negligent misrepresentation and for fraud against BOL and P. Guidry and Guidry's state law claims for fraud and negligence against FNBC, so that the dismissal of each of said particular state law claims is hereby made *without* prejudice; and as so modified the judgment of dismissal of said particular state law claims is affirmed. In all other respects (and as to all other state law claims and all federal law claims), the district court's judgment is affirmed without modification.

---

**7.** The district court provides a more in-depth analysis of the various articulations of the Rule 9(b) requirement and the rationale behind the Rule, with which we generally agree.

AFFIRMED in part; MODIFIED in part, and AFFIRMED as MODIFIED.