**R.P. FULLER, Plaintiff–Appellant,**

v.

**PHILLIPS PETROLEUM COMPANY, Defendant–Appellee.**

No. 88–1531.

United States Court of Appeals, Fifth Circuit.

May 10, 1989.

Robert D. Lemon, Perryton, Tex., for plaintiff-appellant.

Susan L. Edwards, Joe Cochran, Thomas C. Riney, Amarillo, Tex., William G. Paul, John L. Williford, Bartlesville, Okl., for defendant-appellee.

Before RUBIN, POLITZ, and JOHNSON, Circuit Judges.

JOHNSON, Circuit Judge:

Plaintiff R.P. Fuller appeals an order of the district court entering a judgment notwithstanding the verdict in favor of defendant Phillips Petroleum Company (Phillips) on a breach of contract claim asserted by Fuller against Phillips. Persuaded that the district court did not err in construing the language of the joint operating agreement between Phillips and Fuller, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

The instant controversy arose as a result of a dispute over the interpretation of a joint oil and gas operating agreement entered into between R.P. Fuller and Phillips on July 16, 1964, covering certain oil and casinghead gas leases on an approximately 160–acre tract of land described in the operating agreement as the "Unit Area." Phillips owned two oil and gas leases covering an undivided two-thirds interest in the Unit Area, while Fuller owned a single oil and gas lease covering the remaining undivided one-third interest in the Unit Area.

Pursuant to the provisions of the operating agreement between the parties, Phillips drilled a well in 1964 within the Unit Area referred to as the Holliday A–1 Well. The Holliday A–1 well was the only well drilled by Phillips within the Unit Area. Thereafter, the Holliday well ceased production on January 12, 1983, apparently after problems developed due to a casing leak. Because both oil and gas leases owned by Phillips covering the Unit Area provided for the expiration or termination of the leases sixty days following cessation of operations, the two leases expired by their own terms on approximately March 13, 1983, due to the cessation of operations on the leased premises.

After Phillips' two leases had terminated, Phillips notified Fuller in writing on April 26, 1983, of its intent to plug and abandon the Holliday well. Following his receipt of such notice, Fuller stated the following in a letter to Phillips:

This is to inform you per your request in your letter ... that I do not concur with

your intentions or with the contents of the letter.

Despite the above letter by Fuller, Phillips subsequently plugged and abandoned the Holliday well.

Thereafter, Fuller filed the instant action against Phillips claiming that the failure of Phillips to notify Fuller of its intent to plug and abandon the Holliday well prior to the expiration of Phillips' two oil and gas leases constituted a compensable breach of the joint operating agreement between Fuller and Phillips. In response, Phillips filed a counterclaim seeking damages from Fuller for Fuller's alleged failure to pay a proportionate share of the operating expenses for the Holliday well in accordance with the provisions of the operating agreement.

Ultimately, the case was tried before a jury. Answering special issues submitted by the parties, the jury found that Fuller would have taken over Phillips' two-thirds interest in the Unit Area leases if Fuller had been notified by Phillips that those leases were going to expire. The jury then found the amount of damages suffered by Fuller as a result of the breach of the operating agreement by Phillips. The jury further found that Fuller owed Phillips $13,894.61 in operating expenses under the operating agreement. After the jury issued its findings, both Phillips and Fuller filed motions for judgment notwithstanding the verdict of the jury with the district court. In a complete and thorough order issued April 4, 1988, the district court granted the motions for judgment notwithstanding the verdict of both parties, thereby rendering neither party liable to the other. Only Fuller now appeals the order of the district court.

## II. DISCUSSION

On appeal, Fuller maintains that the district court erred in concluding as a matter of law that Phillips did not breach the joint operating agreement between the parties by failing to notify Fuller of its intent to plug and abandon the Holliday well prior to the termination of Phillips' two leases covering the Unit Area. Specifically, Fuller insists that Phillips breached the operating agreement by failing to notify him that both of Phillips' leases would expire at the end of sixty days following January 12, 1983, the date on which production on the Holliday well ceased. In making the above assertion, Fuller relies primarily on two provisions in the operating agreement which we will consider in turn. Initially, however, it is noted that there exists no express provision in the operating agreement which directly requires the operator (Phillips) to notify the nonoperator (Fuller) of an impending lease termination. Thus, Fuller is asking this Court to imply such a duty of notification by virtue of other terms contained in the operating agreement.

### A. Principles of Contract Construction

As previously noted, in the instant case, the district court concluded as a matter of law that Phillips did not breach the operating agreement between the parties. In so concluding, the district court determined that neither Phillips nor Fuller raised any allegation of ambiguity regarding the language contained in the operating agreement. The fact that the district court did not consider there to be an issue of ambiguity in the instant contractual dispute is significant since this Court characterizes the determination by a district court of the non-ambiguity of a contract as a conclusion of law and accordingly, reviews that conclusion de novo. *Southern Natural Gas Co. v. Pursue Energy*, 781 F.2d 1079, 1081 (5th Cir.1986).

It is well established that the primary concern of a court in construing a contract is to ascertain and give effect to the intent of the parties as expressed in the contract. *Gracia v. RC Cola–7–Up Bottling Co.*, 667 S.W.2d 517, 520 (Tex.1984). Further, objective, not subjective, intent of the parties controls and, in the absence of an allegation of ambiguity as to the contract language, the instrument alone will be deemed to express the intent of the parties. *Phillips v. Inexco Oil Co.*, 540 S.W.2d 546, 548 (Tex.Civ.App.—Tyler 1976, writ ref'd n.r.e). Applying Texas principles

of contract construction which govern the instant diversity action, it is noted that Texas courts have stated the following regarding the implication of additional contractual obligations from the express terms of a written agreement:

> In order for a court to read additional provisions into the contract, the implication must clearly arise from the language used, or be indispensable to effectuate the intent of the parties. It must appear that the implication was so clearly contemplated by the parties that they deemed it unnecessary to express it.

*Kutka v. Temporaries, Inc.*, 568 F.Supp. 1527, 1535 (S.D.Tx.1983). We now apply the above legal principles to the specific assertions made by Fuller in the instant appeal.

### B. *Plug and Abandon Clause*

■ To support his position that Phillips breached the operating agreement, Fuller construes Article 16 of the joint operating agreement, entitled "Abandonment of Wells," as implying a duty on Phillips to notify Fuller of its intent to plug and abandon a well *while the underlying leases of Phillips were still alive.* Article 16 of the operating agreement provides:

16. ABANDONMENT OF WELLS

> *No well,* other than any well which has been drilled or reworked pursuant to Section 12 hereof for which the Consenting Parties have not been fully reimbursed as therein provided which has been completed as a producer *shall be plugged and abandoned without the consent of all parties; provided, however, if all parties do not agree to the abandonment of any well, those wishing to continue its operation shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment,* determined in accordance with the provisions of Exhibit "C", *less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall then assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, quality, or fitness for use of the equip-ment and material, all of its interest in the well and its equipment, together with its interest in the leasehold estate* as to, but only as to, the interval or intervals of the formation or formations then open to production. The assignments so limited shall encompass the "drilling unit" upon which the well is located. The payments by, and the assignments to, the assignees shall be in a ratio based upon the relationship of their respective percentages of participation in the Unit Area to the aggregate of the percentages of participation in the Unit Area of all assignees. There shall be no readjustment of interest in the remaining portion of the Unit Area.

> After the assignment, the assignors shall have no further responsibility, liability, or interest in the operation of or production from the well in the interval or intervals then open. Upon request of the assignees, Operator shall continue to operate the assigned well for the account of the non-abandoning parties at the rates and charges contemplated by this agreement, plus any additional cost and charges which may arise as the result of the separate ownership of the assigned well.

(emphasis added).

Interpreting the above provision of the instant operating agreement, the district court found that no duty devolved upon Phillips by virtue of Article 16 to notify Fuller of its intent to plug and abandon the Holliday well prior to the expiration of its underlying leases. In so finding, the district court noted that, "despite the fact that Phillips' underlying leases had lapsed by their own terms, the Agreement remained in full force and effect beyond the expiration of those leases." In this regard, the district court concluded that Phillips continued to have a duty to notify Fuller of its intent to plug and abandon the Holliday well during the life of the operating agreement despite the expiration of the underlying leases.

Further, the district court found the existence of several provisions in the operating agreement recognizing the possibility

of the loss of an underlying lease to be indicative of the parties' intent that Phillips was not under an obligation to notify Fuller of an impending lease termination.[1] Recognizing the significance of these provisions, the district court noted that none of the above provisions imposed monetary liability on the party whose lease terminated. Neither did the assignment provision of Article 16 itself impose any type of monetary liability on Phillips for failing to assign a valid lease. In fact, the language of Article 16 expressly excludes any warranty of title with respect to the lease interest to be assigned under the operating agreement stating that the abandoning party shall assign to the non-abandoning party its lease interest "without warranty, express or implied, as to title or ... quality...."

Finally, and perhaps most importantly, the district court concluded that the expiration of Phillips' two leases covering an undivided two-thirds interest in the Unit Area did not diminish the pre-existing rights of Fuller under his own lease, as Fuller's lease covered an undivided one-third interest in the Unit Area which was held by production on other lands covered by that same lease.

We are persuaded by the above reasoning of the district court in its opinion granting Phillips' motion for judgment notwithstanding the verdict. Article 16 of the operating agreement is express in its terms and mandates notice only of an abandoning party's intent to plug and abandon a well, not notice by that party of an impending lease termination. The fact that other provisions in the operating agreement directly address the occurrence of the expiration or loss of a lease only bolsters this conclusion.[2] Accordingly, we affirm the conclusion of the district court that Article 16 did not impose upon Phillips—directly or by implication—a duty to notify Fuller of its

intent to plug and abandon the Holliday well while the underlying leases of Phillips were alive. While such notice might have been, and in Fuller's eyes would have been, preferable, the fact remains that Phillips did notify Fuller of its intent to plug and abandon the well in accordance with the terms of Article 16; therefore, Phillips did not breach the operating agreement between the parties.

### C. Surrender of Lease

■ In asserting a breach of contract claim against Phillips, Fuller also relies on Article 23 of the operating agreement which requires the consent of all parties before the surrender, in whole or in part, of any lease affecting the Unit Area or, in the absence of such consent, the assignment of such leases to the nonconsenting parties. Specifically, Fuller maintains that Phillips' actions in allowing its leases to terminate due to the cessation of production on the Holliday well constituted an affirmative surrender of its leases requiring the consent of all parties to the operating agreement.

The argument of Fuller in this regard, however, is belied by the legal difference between the terms "surrender" and "termination" of a lease. In the oil and gas industry, the term "surrender" refers to the contractual right of a lessee to voluntarily relinquish to the lessor all or part of the leased premises, thereby allowing the lessee to retain the most profitable portion of a lease while at the same time releasing the least profitable portion of the lease. William & Meyers, 8 *Oil and Gas Law* § 966 (1985). Moreover, while a lease may be terminated by the act of one party by surrendering its rights under the lease, such a surrender may only occur while the lease is in effect. In contrast, "termi-

---

**1.** These provisions include Article 2.B "Failure of Title," Article 2.C "Loss of Leases for other than Title Failure," Article 17 "Delay Rentals and Shut-in Well Payments," and Article 22 "Renewal or Extension of Leases."

**2.** It is further noted that Fuller was receiving monthly statements from Phillips showing gross casinghead gas production and oil and casing-

head gas sales and expenses from the Holliday well. Despite receiving information indicating that the Holliday well was decreasing in production, Fuller apparently never pursued the matter with Phillips. Fuller could have readily requested additional information or clarification regarding the decline in production from the Holliday well.

**660**

nation" of a lease as applied to the facts of the instant case refers to the expiration of a lease by its own terms for the failure of the operator (Phillips) to maintain operations on the leased premises.

Here, the Phillips' leases expired by virtue of the express terms of the leases which provide for the termination of the leases in the event of cessation of operations on the leased premises. Thus, the surrender clause in the operating agreement is inapplicable to the instant dispute. We therefore affirm the conclusion of the district court that Article 23 did not impose a duty on Phillips to notify Fuller of the impending termination of its leases. Because we affirm the conclusion of the district court that Phillips did not breach the operating agreement, we need not address the further contentions of Fuller regarding the damages issue.[3]

AFFIRMED.

---

**3.** Fuller raises several other allegations relating to Phillips' failure to provide the requisite notice of its intent to plug and abandon the Holliday well. Since Fuller neglected to initially present those allegations to the district court, however, we decline to address those contentions for the first time on appeal.