United States Court of Appeals,

Fifth Circuit.

No. 93-7194.

Horace NORMAN, et al., Plaintiffs-Appellants,

v.

APACHE CORPORATION, Defendant-Appellee.

April 29, 1994.

Appeal from the United States District Court for the Southern District of Texas.

Before POLITZ, Chief Judge, KING and DAVIS, Circuit Judges.

KING, Circuit Judge:

The working interest owners of oil and gas leases in Brazoria County, Texas, brought suit against Apache Corporation, with whom they had contracted to operate these leases, claiming breach of contract and breach of fiduciary duty. The district court entered summary judgment for Apache Corporation, and the working interest owners appeal. We affirm in part and reverse in part the judgment of the district court.

## I. BACKGROUND

### A. *Factual Background*

In 1976, owners of interests in oil and gas leases in Brazoria County, Texas, entered into a joint operating agreement with Dow Chemical Company (Dow) to conduct joint oil and gas operations on those leases. Under the operating agreement, Dow was named the operator and was given exclusive control of oil and gas operations. The parties who held interests in these leases (collectively "the owners") were working interest owners.

In 1977, Dow drilled and successfully completed the Dwight and Sue Brothers No. 1 Well (the Brothers well) on the Brazoria County leases. All of these leases contained clauses which authorized the leased acreage, or parts thereof, to be pooled with other leased acreage. Acting pursuant to this authorization, the owners entered into an agreement with working interest owners of other leases to pool the leased acreage. These pooled leases were then unitized into two

production units, the Brothers Gas Unit and the Christian Gas Unit. Certain of these leases were included within the boundaries of the Brothers Gas Unit, and under their own terms, they remained in effect past the primary term so long as oil and gas was being produced on the unit. Further, some of these leases required that if production on the unit ceased, additional operations had to commence within sixty days in order to keep the leases in effect; others provided for a ninety-day period. Because the Brothers well was the only well on the Brothers Gas Unit, these leases were held only by production from the Brothers well. Dow continued to operate both the Brothers Gas Unit and the Christian Gas Unit.

In October 1982, Apache Corporation (Apache) succeeded Dow as the operator for the production units, with all parties still subject to the original 1976 operating agreement. Thus, Apache now had the exclusive right and responsibility to conduct oil and gas operations on the leases for each unit. Apache also had the authority to bill the owners on a monthly basis for expenses incurred in operating the properties and to charge the owners a monthly "administrative overhead charge" for each well Apache operated during the month.

On or about July 13, 1990, Apache decided to cease production of the Brothers well. On July 18, 1990, Apache's district supervisor responsible for the Brothers well, Bryan Chambless, prepared an internal "change of status report" for the well in which he reported that the well had last produced on July 13 and that the reason production had been stopped was "well shut-in uneconomical to produce." The next day, David Tirey, Apache's production engineer, sent an internal memorandum concerning the Brothers well to Apache's managers for drilling and production in the exploration and land department. In this memo, he stated: "[T]he subject well was shut in July 16, 1990 and is not expected to return to production. If any drilling opportunities are considered on this acreage, they need to be expedited."

On September 18, 1990, Apache filed a notice of intention to plug and abandon the Brothers well with the Texas Railroad Commission. In late December 1990, Linda Sebesta, a land assistant for Apache, sent a letter to the owners, stating that the Brothers well "has become uneconomical to produce" and recommended that the well be plugged and abandoned. The owners responded by

requesting that Apache continue to operate the well, but then learned that Apache had ceased operations on the well, that the sixty- or ninety-day periods for commencing additional operations had since passed, and that the leases had been lost.

## B. *Procedural History*

In September 1991, the owners[1] filed suit against Apache in state district court in Brazoria County, Texas. They asserted that

> [i]n July 1990 when Apache shut in the Brothers Well and abandoned efforts to produce it, Apache knew that Plaintiffs believed that there was substantial hydrocarbon reserves to be recovered from the Brothers Gas Unit. In July 1990 Apache knew that Plaintiffs wanted Apache to continue to operate the Brothers Well in order to obtain revenues from current operations and in order to hold the Brothers Unit leases. Nonetheless, Apache failed to disclose to the Plaintiffs Apache's decision to abandon the Brothers Well. Instead, during the period July-December 1990, Apache continued to send monthly billing statements to Plaintiffs representing that Apache was continuing to operate the Brothers Well.

The owners alleged that Apache had breached its contractual and fiduciary duties under the joint operating agreement to operate the Brothers well, to give them advance notice of its decision to abandon the Brothers well, to take reasonable actions to prevent the lapse of the Brothers Unit leases, to notify them of the cessation of production from the Brothers well, and to refrain from falsely representing to them that it continued to operate the Brothers well after July 1990. They also alleged that Apache's breach of its fiduciary duties was accompanied by its "knowing and wilful disregard for the rights and interests" of the plaintiffs, thereby entitling them to punitive damages. Apache then removed the case to federal district court on the basis of diversity jurisdiction.

During a scheduling conference conducted by the district court on April 2, 1992, the owners requested leave of court to file an amended complaint. Their counsel offered to have the amended complaint filed within thirty days, and the court orally granted their request for leave to amend with the instruction that the amended complaint be filed as soon as possible.

The owners filed an amended complaint on September 15, 1992. On October 14, 1992, Apache filed a motion for summary judgment based on the owners' *original* complaint. In its motion,

---

[1]The working interest owners who filed suit are Jack Norman; J.S. Norman; Wendell Klein; Jack Finkelstein, Trustee; Robert Lawe; Jim Finkelstein, C.S. DOH; Jack Finkelstein, Jr.; Stephred, Inc.; Diboll Oil Company Meridian Partners No. 5; Texas Commerce Bank, N.A.; and Jack Finkelstein, Trustee, and Brazoria 475, a Joint Venture.

Apache stated that the amended complaint was not properly before the court. Apache contended that the amended complaint was not properly filed because the owners neither had sought leave of court in writing, as required by the local rules, nor had sought Apache's consent. Apache thus asserted that because the owners' original complaint was the only active pleading in the case, two new causes of action set forth in the amended complaint—fraud and the recovery of excessive operating costs—had not been properly pleaded.

After a pre-trial hearing on October 27, 1992, the magistrate ordered that the amended complaint be stricken. In reviewing the tape recording of the scheduling conference at which the owners had requested and orally received leave to amend their complaint, the magistrate found that counsel for the owners had stated that he anticipated the *possibility* of needing to file an amended complaint and that if an amended complaint were needed, he would file it within thirty days. The magistrate determined that although the owners had been given, in open court, leave to amend their complaint, the amendment—ultimately filed more than five months after leave was granted and approximately thirty days before the discovery deadline—was untimely. The owners then simultaneously filed a motion for reconsideration and a motion for leave to amend their complaint.

On November 16, 1992, the district court denied Apache's motion for summary judgment. In its order denying Apache's motion, the district court recognized that the owners had set forth various causes of action, including the two new causes of action set forth in the amended complaint. The court also stated that it was "perturbed" that Apache had addressed only those causes of action set forth in the original complaint in its motion for summary judgment and that thus "the issues in this case are so ill-suited for summary judgment as to raise serious questions in the Court's mind as to whether this motion was filed for the sole purpose of harassing the plaintiffs."

Apache then filed a motion for rehearing and for clarification on November 20, 1992. In its motion, Apache explained that the owners' original complaint concerned only claims predicated on breach of contract and breach of fiduciary duty and that the additional causes of action referenced by the court were contained in their amended complaint, which had been stricken by the magistrate.

The case remained on the district court's "trailing docket" from November 1992 through

February 1993, awaiting trial assignment on short notice. On March 11, 1993, the district court *sua sponte* reconsidered its previous denial of Apache's motion for summary judgment and granted the motion. The court indicated that its first order concerning Apache's summary judgment motion had been based upon "the Court's inadvertent reference to the causes of action set out in the Amended Complaint." The court also clarified that its ruling granting summary judgment for Apache was based exclusively on allegations contained in the owners' original complaint and "specifically affirm[ed] the Magistrate-Judge's Order in all respects," which included the striking of the amended complaint. The owners then filed a timely notice of appeal.

## II. STANDARD OF REVIEW

The decision to grant or deny a motion to amend pleadings is entrusted to the sound discretion of the district court. *Avator Exploration, Inc. v. Chevron, U.S.A.,* 933 F.2d 314, 320 (5th Cir.1991). We thus review a district court's denial of a motion to amend pleadings for an abuse of that discretion. *Id.*

We review *de novo* a district court's dismissal of a claim on the pleadings. *Guidry v. Bank of LaPlace,* 954 F.2d 278, 281 (5th Cir.1992); *Walker v. South Cent. Bell Tel. Co.,* 904 F.2d 275, 276 (5th Cir.1990). In so doing, we " "accept the complaint's well-pleaded factual allegations as true.' " *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 520 (5th Cir.1993); *Guidry,* 954 F.2d at 281.

We review the granting of summary judgment *de novo,* applying the same criteria used by the district court in the first instance. That is, we review the evidence and inferences to be drawn therefrom in the light most favorable to the non-moving party. *Federal Deposit Ins. Corp. v. Dawson,* 4 F.3d 1303, 1306 (5th Cir.1993); *Fraire v. City of Arlington,* 957 F.2d 1268, 1273 (5th Cir.), *cert. denied,* --- U.S. ----, 113 S.Ct. 462, 121 L.Ed.2d 371 (1992). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).

## III. DISCUSSION

### A. *Motion to Amend Complaint*

The owners first contend that the district court erred in not addressing their motions for reconsideration and for leave to amend their complaint, which had been simultaneously filed after the magistrate had stricken their amended complaint on grounds that it had not been timely filed. They argue that although the decision to grant leave to amend is normally left to the sound discretion of the trial court, in this case the district court did not even attempt to exercise its discretion but instead simply declined to act on their motion. They also suggest that if the district court did implicitly deny their motion to amend, the court abused its discretion because it did not identify the reasons for its decision. Nonetheless, we find the owners' arguments to be without merit.

The denial of a motion by the district court, although not formally expressed, may be *implied* by the entry of a final judgment or of an order inconsistent with the granting of the relief sought by the motion. *Addington v. Farmer's Elevator Mut. Ins. Co.,* 650 F.2d 663, 666 (5th Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981). In its order of dismissal in which it granted Apache's motion for summary judgment, the district court implicitly denied the owners' motion for leave to amend in the instant case. Specifically, the district court stated:

> The Plaintiffs filed with this Court a motion to reconsider the Magistrate-Judge's Order, upon which the Court took no action. Nevertheless, in light of the Court's decision today, the court now sees fit to specifically affirm the Magistrate-Judge's Order in all respects. Furthermore, the parties should not infer that the Court in any way ratified the Plaintiffs' Amended Complaint or overruled the Magistrate-Judge's Order through the Court's inadvertent reference to the causes of action set out in the Amended Complaint in this Court's first Order concerning the Defendant's Motion for Summary Judgment.

The district court's granting Apache's motion for summary judgment and dismissing the owners' suit is thus so inconsistent with the owners' motion to amend as to implicitly deny the motion. Further, by affirming the magistrate's order in all respects, the district court implicitly denied the owners' motion to amend their complaint for the reason stated in the magistrate's order, i.e., the amended complaint was not timely filed. The owners do not dispute that although the district court orally granted their motion for leave to amend, that leave extended only for a limited period of time and their amended complaint was not filed within those limits. Hence, we cannot say that the district court abused its discretion in implicitly denying the owners' motion for leave to amend their complaint.

## B. *Claim of Fraud*

The owners also contend that the district court erred in holding that their original complaint did not allege sufficient facts to support a claim of fraud. They argue that this holding is fundamentally inconsistent with the district court's acknowledgement that the owners had alleged that Apache made misrepresentations to the owners concerning Apache's own conduct. Specifically, the owners contend that because their petition alleges (1) that Apache stopped production of the Brothers well in July 1990, (2) that Apache sent monthly billing statements to the owners through December 1990, (3) that these billing statements amounted to misrepresentations that Apache was continuing to operate the Brothers well, and (4) that Apache's conduct caused them injury, their petition states with factual particularity the circumstances constituting fraud. However, we disagree.

Rule 9(b) of the Federal Rules of Civil Procedure requires that in all averments of fraud, "the circumstances constituting fraud or mistake shall be stated with particularity." Although the defendant's state of mind may be averred generally, Rule 9(b) requires the plaintiff to allege "the existence of facts and circumstances sufficient to warrant the pleaded conclusion that fraud ha[s] occurred" or face dismissal of his claim. *Haber Oil Co. v. Swinehart (In re Haber Oil Co.),* 12 F.3d 426, 439 (5th Cir.1994) (internal quotation and citation omitted). Allegations of fraud must thus meet "a higher, or more strict, standard than the basic notice pleading required by Rule 8." *Shushany,* 992 F.2d at 521. This standard is derived from concerns that unsubstantiated charges of fraud can irreparably damage a defendant's reputation. *Guidry,* 954 F.2d at 288. Further, Rule 9(b) is designed "to preclude litigants from filing baseless complaints and then attempting to discover unknown wrongs." *Shushany,* 992 F.2d at 521 (internal quotation and citation omitted). To state a cause of action for fraud under Texas law, a plaintiff must allege sufficient facts to show that (1) a material representation was made; (2) the representation was false; (3) the speaker made the representation knowing it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) the speaker made the representation with the intention that it should be relied upon by the party; (5) the party acted in reliance upon the misrepresentation; and (6) the party thereby suffered injury. *See Haber Oil,* 12 F.3d at 437 (5th Cir.1994) (citing *DeSantis v. Wackenhut Corp.,*

793 S.W.2d 670, 688 (Tex.1990)).

The owners concede that the allegations in their original petition are "inartful," but contend that their failure to use the term "fraud" in their original petition should not preclude their being able to recover under that legal theory. They assert that "a complaint is sufficient if the plaintiff is entitled to relief under *any* legal theory," citing this court's decision in *Thompson v. Allstate Ins. Co.,* 476 F.2d 746 (5th Cir.1973), for that proposition. The owners' reliance on *Thompson,* however, is without merit. In *Thompson,* we reversed the district court's dismissal of the plaintiff's state law claim for intentional interference with another's business under Federal Rule of Civil Procedure 12(b)(6). *Id.* at 750. Nonetheless, our decision was premised on the fact that the plaintiff had given "fair notice" of what his claim was under Federal Rule of Civil Procedure 8, which requires only "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds on which it rests." *Id.* at 749 (internal quotation and citation omitted). Thus, in *Thompson* we did not deal with the requirements of Rule 9(b), which mandate that to state a claim for fraud the plaintiff must set forth sufficient facts in the complaint to warrant the conclusion that fraud has occurred, as we do here. Although we recognize that Rules 8 and 9(b) are to be harmonized, Rule 8 has never been read to eviscerate Rule 9(b)'s requirement that an averment of fraud must be stated with particularity.

The owners have failed to allege sufficient facts to state with particularity the circumstances constituting fraud as required by Rule 9(b). The district court thus correctly determined that the plaintiffs failed to state a claim for fraud against Apache in their original complaint.

## C. *Fiduciary Duty*

The owners also contend that the district court erred in granting Apache summary judgment on their breach of fiduciary duty claims, finding that the owners failed to provide any evidence which cast doubt on Apache's claim that no fiduciary duty existed between the parties. They assert that summary judgment evidence created an issue of material fact as to whether Apache, as the operator of oil and gas operations on leases in which they held an interest, had a fiduciary relationship with the owners. Nonetheless, we disagree.

The owners correctly state that under Texas law, the determination of whether a fiduciary relationship exists between the parties is a question of fact for the jury. *Schiller v. Elick,* 240 S.W.2d 997, 999 (Tex.1951). However, that the determination of whether a fiduciary relationship exists is a fact question did not abolish the owners' burden to come forward with specific facts demonstrating that there is a genuine issue of material fact for trial after Apache moved for summary judgment and offered evidence that no fiduciary relationship existed. Under Federal Rule of Civil Procedure 56(c), the party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this burden is met, the burden shifts to the non-moving party to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986); *Leonard v. Dixie Well Serv. & Supply Inc.,* 828 F.2d 291, 294 (5th Cir.1987). The burden on the non-moving party is to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1355-56.

Apache moved for summary judgment on the owners' breach of fiduciary duty claims on grounds that neither the joint operating agreement itself nor the circumstances surrounding the relationship between the owners and Apache demonstrated the existence of a fiduciary duty between the parties. Apache argued that a letter agreement dated February 10, 1976, which became part of the joint operating agreement, clearly stated that the agreement did not constitute or create a fiduciary relationship of any kind or character between the parties. Hence, Apache contended that the parties' own agreement expressly negated the existence of a fiduciary relationship between them. The district court agreed.

Because the instant suit is in federal court on the basis of diversity jurisdiction, we are bound by principles enunciated in *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to apply Texas rules of contract construction to the joint operating agreement at issue. *See Brooks, Tarlton, Gilbert, Douglas & Kressler v. United States Fire Ins. Co.,* 832 F.2d 1358, 1364

(5th Cir.1987). The primary concern a court has in construing a contract is to ascertain and give effect to the intent of the parties as expressed in the contract. *Fuller v. Phillips Petroleum Co.,* 872 F.2d 655, 657 (5th Cir.1989) (citing *Gracia v. RC Cola-7-Up Bottling Co.,* 667 S.W.2d 517, 520 (Tex.1984)). The objective intent of the parties controls, and absent an allegation of ambiguity in the contract's language, the contract alone will generally be deemed to express the intent of the parties. *Id.* (citing *Phillips v. Inexco Oil Co.,* 540 S.W.2d 546, 548 (Tex.Civ.App.—Tyler, 1976, writ ref'd n.r.e.)). Moreover, Texas courts have made it clear that

> [i]n order for a court to read additional provisions into the contract, the implication must clearly arise from the language used, or be indispensable to effectuate the intent of the parties. It must appear that the implication was so clearly contemplated by the parties that they deemed it unnecessary to express it.

*See Kutka v. Temporaries, Inc.,* 568 F.Supp. 1527, 1535 (S.D.Tex.1983) (citing *Danciger Oil & Ref. Co. v. Powell,* 154 S.W.2d 632 (Tex.1941)).

Paragraph 7 of the letter agreement that is part of the joint operating agreement at issue states:

> The obligations and liabilities of the parties hereto shall be several and not joint or collective, and each party shall be responsible only for his or its obligations in accordance with the terms and conditions of this agreement. This agreement does not constitute or create a joint venture or partnership, mineral or otherwise, or association, or agency or a fiduciary relationship of any kind or character whereby any party hereto shall become liable for the acts and deeds of any other party hereto....

The language of this paragraph itself belies Apache's argument that the contract to which the owners and Apache are parties expressly negates the existence of any fiduciary relationship between them. The full text of this paragraph addresses the relationship of Apache and the owners only insofar as it concerns potential liabilities or obligations to *third parties. See Johnston v. American Cometra, Inc.,* 837 S.W.2d 711, 715-16 (Tex.App.—Austin 1992, writ denied) (citing a line of Texas cases which hold that language in an operating agreement similar to that of paragraph 7 of the instant letter agreement shield non-operators from liability to third-party creditors for the operator's debts). It does not, however, address the type of relationship that exists between the owners and Apache in terms of their duties or liability to one another.

Although the joint operating agreement at issue here does not expressly negate the existence

of a fiduciary relationship between the owners and Apache, its mere existence does not ensure that such a relationship exists, as the owners suggest.  Under Texas law, "evidence of a joint operating arrangement to develop a particular lease [in and of itself] will not support a finding of a broader relationship," such as a partnership or joint venture.  *Rankin v. Naftalis,* 557 S.W.2d 940, 946 (Tex.1977);  *see* 2 EUGENE KUNTZ, A TREATISE ON THE LAW OF OIL AND GAS 109 (1989) ("The [Joint Operating Agreement] is not intended to create any relation between the operator and nonoperators nor among nonoperators that is beyond the contractual relationship."); Gary B. Conine, *Property Provisions of the Operating Agreement—Interpretation, Validity, and Enforceability,* 19 TEX.TECH L.REV. 1263, 1274-76 (1988) (explaining that under Texas law, a joint operating agreement in and of itself does not necessarily create the joint venture or form of partnership necessary to impose fiduciary duties on the parties).  Thus, unless specifically set forth in the operating agreement itself, a fiduciary relationship arises between an operator and working interest owners not from the contractual joint operating agreement, but from a "special relationship" that exists between them, e.g., a partnership, joint venture, or agency relationship.  *See, e.g., Crowder v. Tri-C Resources, Inc.,* 821 S.W.2d 393, 399 (Tex.App.—Houston [1st Dist.] 1991, no writ) (determining that the relationship between the non-operators and the operator pursuant to the joint operating agreement between them did not give rise to the duty of good faith and fair dealing that would arise in a partnership);  *Taylor v. GWR Operating Co.,* 820 S.W.2d 908, 911-12 (Tex.App.—Houston [1st Dist.] 1991, writ denied) (explaining that a joint operating agreement does not necessarily imply a joint venture between the parties to the agreement); *Hamilton v. Texas Oil & Gas Corp.,* 648 S.W.2d 316, 320 (Tex.App.—El Paso 1982, writ ref'd n.r.e.) (confirming that a joint operating agreement did not necessarily create either a joint venture or a mining partnership and that thus parties to the agreement were not necessarily involved in a fiduciary relationship).

The owners do not argue that their relationship with Apache should be classified as a partnership, a joint venture, or an agency relationship.  They do, nonetheless, contend that the district court erred in granting summary judgment on their fiduciary duty claims because they produced evidence to create a genuine fact issue that "under the circumstances" of the instant case, a fiduciary

relationship between them and Apache had been created.

Texas courts have long recognized that certain informal relationships may give rise to a fiduciary duty. *See Crim Truck & Tractor v. Navistar Int'l Trans. Corp.,* 823 S.W.2d 591, 594 (Tex.1992); *MacDonald v. Follett,* 180 S.W.2d 334, 337-38 (Tex.1944). "Such informal fiduciary relationships have also been termed "confidential relationships' and may arise "where one person trusts in and relies upon another, whether the relation is a moral, social, domestic or merely personal one.'" *Navistar,* 823 S.W.2d at 594 (quoting *Fitz-Gerald v. Hull,* 237 S.W.2d 256, 261 (Tex.1951)). However, because not every relationship involving great trust and confidence should be deemed fiduciary in nature, Texas law recognizes a "confidential" or fiduciary relationship to exist only in cases " "in which influence has been acquired and abused, in which confidence has been reposed and betrayed.' " *Id.* (quoting *Texas Bank & Trust Co. v. Moore,* 595 S.W.2d 502, 507 (Tex.1980)).

The owners offered the affidavit evidence of Jack Finkelstein, a working interest owner in the instant case, to support their claim that a fiduciary relationship existed between them and Apache. Finkelstein attested that it was common and expected in the oil and gas business for an operator to inform non-operators when a well holding acreage is taken off of production. Finkelstein also attested to the fact that through December 1990 he received monthly billing statements from Apache showing that Apache was continuing to operate the Brothers well. Nonetheless, his attestation does not provide sufficient facts to indicate that the owners and Apache had the type of "confidential" relationship Texas law requires to impose a fiduciary duty on Apache to put the interests of the working interest owners before its own.

Moreover, although the owners offered as evidence the operating agreement itself in that it grants to Apache the exclusive right to conduct oil and gas operations on the Brothers Unit, such evidence is unavailing. As we stated earlier, Texas law is clear that such an agreement does not *of itself* give rise to a fiduciary duty between the operator and non-operating working interest owners. *See Rankin,* 557 S.W.2d at 946; *Hamilton,* 648 S.W.2d at 321 (determining that evidence that the non-operators were not contractually given the *mutual* right of control or management of the enterprise was dispositive that no joint venture, and hence no fiduciary relationship, existed). Further,

the owners' evidence that Apache had exclusive control of oil and gas operations on the Brothers Unit leases for almost eight years and had operated the well for many years preceding the cessation of production in 1990 is equally unavailing. The fact that a relationship has been "a cordial one, of long duration" is not evidence of a "confidential" relationship which imposes fiduciary duties under Texas law. *Navistar,* 823 S.W.2d at 595 (citing *Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex.1962)).

The only other evidence the owners offered to show that an issue of material fact existed for trial was the affidavit evidence of Roy W. Richard, Jr., one of the joint venturers in Brazoria 475, a working interest owner in leases in the Brothers Gas Unit. Richard attested that in late January 1989 he had drafted a letter to Rod Eaton, land manager for Apache, expressing concern over the costs of the continued operations of the Brothers well and requesting that Apache stop operating the Brothers well or provide an explanation of why it was necessary to continue its operati on. Attached to his affidavit was the reply he received from David Tirey, a production manager for Apache, dated February 29, 1989. Tirey wrote that Apache did not plan on discontinuing operations on the Brothers well at that time. Tirey also stated that

> [a]t the present time, termination of operations on the Brothers well would not allow us to keep the leasehold acreage. This would allow another operator to pick up the acreage, and drill another well, which could drain reserves from our Christian Unit. We recently have reduced our saltwater disposal costs on the lease, which should put the lease in a profitable position.

Richard attested that Brazoria 475 did not investigate whether the leasehold acreage was being kept because it believed that Apache was operating and intended to continue to operate the Brothers well as Tirey's letter indicated. Although Richard's attestation thus indicates that Brazoria 475 trusted that Apache would continue to operate the Brothers well indefinitely, " "mere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship.' " *Navistar,* 823 S.W.2d at 595 (quoting *Thigpen,* 363 S.W.2d at 253).

Taking the summary judgment evidence produced as a whole, we cannot say that this evidence co uld lead a rational trier of fact to find for the owners, the non-moving party. *See Matsushita,* 475 U.S. at 587. We thus fail to see how the summary judgment evidence which the owners pro duced cast any doubt on Apache's assertion that no fiduciary duty existed between the

parties.  Accordingly, the district court did not err in granting summary judgment in favor of Apache on the owners' fiduciary duty claims.

## D. *Breach of Contract*

The owners further contend that the district court erred in granting Apache summary judgment on their claims that Apache breached its contractual duties to notify the working interest owners promptly when it shut in the Brothers well and to conduct itself as an reasonably prudent operator under the circumstances.  We deal with each of their claims in turn.

## 1. *Failure to Notify*

The owners expressly relied on the provisions of section 17 of the joint operating agreement for their claim that Apache breached its contractual duty to them by failing to notify the owners when Apache "shut in" the Brothers well.  The owners contended that Apache's cessation of production in mid-July 1990 constituted a "shut-in" of the Brothers well.  Apache, however, argued that it did not "shut in" the well, as contemplated in section 17, but instead had "abandoned" the well and that thus section 16 of the joint operating agreement, which governed conduct related to the abandoning of a well, was applicable.

Sections 16 and 17 of the joint operating agreement deal with abandoned wells and shut-in wells, respectively.  Section 17, entitled "Delay Rentals and Shut-in Gas Well Payments," provides:

> Operator shall pay all delay rentals and shut-in well payments which may be required under the terms of all leases covered by this agreement and submit evidence of each payment to the other parties.  Each party shall notify the other, in writing, at least thirty (30) days prior to the date any rental payment is due, as to whether or not it elects to participate in the payment thereof.  In the event either party elects not to participate in a rental payment, and the other party elects to participate therein, then the party desiring not to participate shall promptly execute and deliver to the party desiring to participate in such rental payment an assignment of such non-participating party's right, title and interest in and to such lease, or leases, and such lease, or leases, shall no longer be subject to this agreement.  The amount of such payments, when made for the account of both parties, shall be charged by Operator to the joint account of the parties.  Operator shall not be liable to the other party in damages for the loss of any lease or interests therein if, through mistake or oversight, any rental or shut-in well payment is not paid.  There shall be no adjustment of interests of the parties in the remaining portion of the Unit Area in the event of a failure to pay, or erroneous payment of rental or shut-in well payments.  If any party secures a new lease covering the terminated interest, such acquisition shall be subject to the provisions of Section 23 of this agreement.

> *Operator shall promptly notify each party hereto of the date on which any gas well located on the Unit Area is shut in and the reason therefor and the date on which said well is restored to production.*  (emphasis added)

Thus, this section of the joint operating agreement places an express contractual duty on the operator to notify promptly the working interest owners when a well is "shut in." Section 16, on the other hand, entitled "Abandonment of Wells," imposes no contractual duty on the operator to notify the working interest owners when it is abandoning a well, i.e., ceasing production permanently.[2] *See Fuller v. Phillips Petroleum Co.,* 872 F.2d 655, 658-59 (5th Cir.1989) (interpreting an identical provision in another joint operating agreement as not imposing upon the operator—directly or by implication—a duty to notify the working interest owners of its intent to plug and abandon the well while the underlying leases of the owners were alive).

In granting Apache's motion for summary judgment on this claim, the district court first determined that although "shut in" is a generic term used to refer to the closing of the valves through which oil and gas flow through a well, its *legal* meaning refers to the closing of valves "when production at a well capable of producing in paying quantities is temporarily halted to repair or clean the well, to allow reservoir pressure to build, or for lack of market." The district court further reasoned that a "shut-in gas well clause," like section 17 in the instant joint operating agreement, refers to a provision in the underlying lease agreement whereby a lessee is authorized to pay a shut-in royalty to the lessor and thus keep a lease alive without actual production when and if a well has been drilled which is capable of producing in paying quantities but which is for some reason temporarily "shut in." Hence, the district court concluded that the term "shut in," as used in section 17, specifically did *not* contemplate the *permanent* cessation of production.

---

[2]Section 16 provides in pertinent part:

> No well, other than any well which has been drilled or reworked pursuant to Section 12 hereof for which the Consenting parties have not been fully reimbursed as therein provided, which has been completed as a producer shall be plugged and abandoned without the consent of all parties; provided, however, if all parties do not agree to the abandonment of any well, those wishing to continue its operation shall tender to each of the other parties its proportionate share of the value of the well's salvable material and equipment ... less the estimated cost of salvaging and the estimated cost of plugging and abandoning. Each abandoning party shall then assign to the non-abandoning parties, without warranty, express or implied, as to title or as to quantity, quality, or fitness for use of the equipment and material, all of its interest in the well and its equipment, together with its interest in the leasehold estate as to, but only as to, the interval or intervals of the formation or formations then open to production....

We agree with the conclusion of the district court. We first emphasize that the express language of section 17 itself supports the district court's conclusion. The section's mandatory notice requirement is phrased in the conjunctive, thus requiring that the operator promptly notify each working interest owner of three things: (1) the date on which any gas well located on the unit is shut in, (2) the reason for the shut-in, and (3) the date on which the well is restored to production. Under Texas law, terms used in a contract, if not ambiguous, are to be given their plain, ordinary and generally accepted meaning unless the instrument itself shows that the terms have been used in a technical or different sense. *See Brooks,* 832 F.2d at 1364 (citing *Ramsay v. Maryland Am. Gen. Ins. Co.,* 533 S.W.2d 344, 346 (Tex.1976)). In everyday usage, the term "restore" means "to bring back into existence or use"; "to reestablish"; or "to bring back to an original condition." *See* American Heritage Dictionary 1054 (1982). It is this third requirement of the notice provision, joined conjunctively to the other two, that makes the entire notice provision of section 17 contemplative of the *temporary* cessation of production.

Moreover, we have found no Fifth Circuit or Texas case even remotely indicating that the term "shut in," as used in the instant joint operating agreement, refers to the permanent cessation of production. In fact, quite the opposite is true. For example, in *Duke v. Sun Oil Co.,* 320 F.2d 853 (5th Cir.1963), this court reviewed the effect of a "shut-in royalty clause" in a Texas oil and gas lease. The lease itself provided that the lessee could keep the lease alive if, after the expiration of the lease's primary term, the well holding the lease continued to produce or the lessee timely paid shut-in royalties to the lessor during the period in which the well was capped. *Id.* at 860. We determined that the plain terms of the lease thus indicated that the lease could be kept alive by either actual or "constructive" production, i.e., the payment of shut-in royalties. *Id.* In reaching this determination, we reviewed the Texas Supreme Court's decision in *Skelly Oil Co. v. Harris,* 352 S.W.2d 950 (Tex.1962), in which the court discussed a lease's cessation of production clause—which provided that once the primary term had expired, the lease would remain in effect so long as operations were "prosecuted with no cessation of more than sixty (60) consecutive days"—as a means of maintaining the lease during *temporary* periods of inactivity. *Id.* Accordingly, we viewed the shut-in clause in

question in the same light, i.e., as a clause which allows a lessee—upon the timely paying of shut-in royalties—to maintain the lease when a well is temporarily shut in for various reasons but is capable of actual production. *Id.* at 860-61.

Other Texas cases discuss shut-in royalty clauses, and thus the term "shut in" as it is used in an oil and gas lease, in connection with the temporary cessation of production. *See Mayers v. Sanchez-O'Brien Minerals Corp.,* 670 S.W.2d 704, 709 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.) (determining that under the terms of the shut-in clause of the lease in question, "the shut-in payment acts as constructive production if within the 60 days after the expiration of the shut-in payment period actual oil, gas, or other mineral is produced"); *cf. Kidd v. Hoggett,* 331 S.W.2d 515, 519 (Tex.Civ.App.—San Antonio 1959, writ ref'd n.r.e.) (explaining that the payment of shut-in royalties does not keep a lease alive if the well holding the lease was "shut in" but had *never* been capable of actual production). Commentators have also indicated that the term "shut in" as used in various clauses in an oil and gas lease refers to the temporary cessation of production because the clauses in which this term is used have been designed to provide the lessee with a means of holding the lease when the oil or gas from a producing well cannot be marketed or used for various reasons. *See, e.g.,* 3 KUNTZ, *supra,* at 2-28 (explaining that shut-in royalty clauses are designed to protect a lease when a well must be shut in because the gas that is capable of being produced cannot be marketed for various reasons, e.g., no market exists at that time or a temporary mechanical problem has developed); HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW 350-61 (Abridged ed. 1993) (discussing the development of shut-in royalty clauses, which are designed to provide a means of holding a lease beyond the expiration of the primary term when the product of a producing well cannot be sold or used during the time of the shut-in).

In the joint operating agreement at issue, section 17 as a whole is entitled "Delay Rentals and Shut-In Gas Well Payments." Because the section itself is set forth to deal with the logistics of shut-in royalty payments, which—as we just discussed—are a means for a lessee to hold a lease after the primary term has expired when production is temporarily halted, so too must the term "shut in" as used *within* that section refer to a temporary cessation of production.

Consequently, because we find section 17 to contemplate only a temporary cessation of production, the owners can defeat Apache's motion for summary judgment if they have produced evidence to create a genuine fact question on whether the cessation of production which occurred in the instant case could have been deemed "temporary." The uncontroverted facts, however, clearly indicate that Apache fully intended to halt production completely and irrevocably at the Brothers well in mid-July 1990. The interoffice memo from David Tirey states that the Brothers well was shut in and "not expected to return to production." The deposition testimony of Donald E. Harris indicates that Apache never co nsidered making any shut-in well payments with respect to the leases on the Brothers Unit after it ceased producing the Brothers well in mid-July 1990. Moreover, summary judgment evidence shows that Apache not only filed a notice with the Texas Railroad Commission of its intention to plug and abandon the Brothers well but also received bids from several contractors for plugging operations and sought the owners' consent to plug and abandon the well.

The owners provided the district court with no evidence that a temporary cessation was ever in contemplation when Apache halted production at the Brothers well. Because the owners did not meet their burden under *Celotex* and *Matsushita,* we can not conclude as a matter of law that the owners are able to rely on section 17 to allege that Apache breached the joint operating agreement by failing to give them notice of the cessation of production from the Brothers well.

Moreover, because the summary judgment evidence indicates that all production on the Brothers well was permanently stopped as of mid-July 1990 and that Apache intended to abandon the well, section 16 of the joint operating agreement governs Apache's duties with respect to giving notice to the owners. As this court has already determined, section 16 of the joint operating agreement does not mandate that an operator give working interest owners notice of an impending lease termination because of the operator's intent to plug and abandon the well. *Fuller,* 872 F.2d at 659. The district court, therefore, did not err in granting Apache summary judgment on this issue.

2. *Failure to Act as a Reasonably Prudent Operator*

The owners also contend that the district court erred in granting summary judgment for Apache on the owners' claim that Apache breached the joint operating agreement by failing to

conduct itself as would a prudent operator under the circumstances. Specifically, the owners asserted that Apache had breached its duty as a prudent operator by failing to take reasonable steps to prevent the loss of the lease on the Brothers Unit and by misrepresenting that it was continuing to operate the Brothers well by sending monthly billing statements through December 1990.

The owners referred to section 5 of the joint operating agreement as the basis for their claims. Section 5 specifically states that Apache

> shall be the Operator of the Unit Area, and shall conduct and direct and have full control of all operations on the Unit Area as permitted and required by, and within the limits of, this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained, or liabilities incurred, except such as may result from gross negligence or from breach of the provisions of this agreement.

Texas courts have determined that in the context of a joint operating agreement, the requirement that Apache conduct all operations—as permitted by, required by, and within the limits of the agreement—in "a good and workmanlike manner" means that Apache has a duty to perform such operations "as a reasonably prudent person engaged in drilling oil wells," i.e., as a reasonably prudent operator. *Johnston,* 837 S.W.2d at 716; *cf. Westbrook v. Watts,* 268 S.W.2d 694, 697-98 (Tex.Civ.App.—Waco 1954, writ ref'd n.r.e.) (interpreting "good and workmanlike manner," in the context of a drilling contract, to mean "as a reasonably prudent person engaged in drilling oil wells"); Ernest E. Smith, *Duties and Obligations Owed by an Operator to Nonoperators, Investors, and Other Interest Owners,* 32 ROCKY MTN.MIN.L.INST. 12-1, 12-20 (1986) ("The reasonable prudent operator standard, which governs the lessee's conduct under the typical oil and gas lease, is normally assumed to govern the operator's conduct under the operating agreement also.").

Apache argued, and the district court agreed, that the "good and workmanlike manner" provision contained within section 5, which requires an operator to perform as a reasonably prudent operator, simply sets forth the standard to be applied to Apache's performance of the operations *expressly required* by the joint operating agreement and does not create any independent duties. The district court thus noted that because the owners had not demonstrated the existence of some obligation required under the joint operating agreement that Apache had failed to perform, Apache was entitled to summary judgment on the owners' claim for breach of contract under section 5 of the

agreement.

The owners contend nonetheless that the district court erred in reaching this conclusion because in *Johnston* a Texas appeals court had already rejected the position taken by Apache and the district court. The *Johnston* court considered the claims of the working interest owners that the operator had failed to assert take-or-pay claims against a third-party product purchaser. 837 S.W.2d at 715. The operator argued that under the joint operating agreement, it had no express contractual duty to assert those claims. *Id.* Nonetheless, the court rejected the operator's argument. It concluded that because the joint operating agreement required the operator to perform its contractual duties "in a good and workmanlike manner," i.e., as would a reasonably prudent operator, the operator owed the working interest owners a duty to perform as a reasonably prudent operator in deciding whether to assert a take-or-pay claim against a third-party purchaser on behalf of the owners. *Id.* at 716.

We thus recognize that the *Johnston* court determined that under Texas law, the scope of an operator's duty is not necessarily limited to only those affirmative obligations expressly detailed in the joint operating agreement. We agree with the district court that section 5 of the joint operating agreement requires that Apache conduct itself in "a good and workmanlike manner," i.e., as would a reasonably prudent operator under the circumstances, with respect to operations required or permitted by the joint operating agreement. Nonetheless, we cannot determine as a matter of law that Apache did not breach its duty to conduct itself as a reasonably prudent operator *under the specific circumstances of this case.*

The owners have alleged that Apache failed to conduct itself as a reasonably prudent operator by ceasing operation on the Brothers well *after* Apache had advised the owners by letter in February 1989 that termination of operations on the well "would not allow [Apache] to keep the leasehold acreage" and "would allow another operator to pick up the acreage, ... [possibly draining] reserves from [the] Christian Unit." The owners thus contend that after having given them the assurances that operations would continue on the Brothers well to hold the leases, Apache undertook upon itself—as "permitted" by the joint operating agreement—the duty to continue operations on the well or to take

reasonable action to prevent the loss of the Brothers Unit leases and that Apache breached this duty.

In its motion for summary judgment, Apache addressed only the owners' claim that it had failed to give them notice of the cessation of production on the Brothers well in terms of its expressly detailed duties under sections 16 and 17 of the joint operating agreement, contending that the "good and workmanlike manner" requirement of section 5 was inapplicable to Apache's conduct at issue because Apache was not required to give notice of the cessation of production under either of these sections. Apache did not, however, address the owners' claim that it failed to perform as a reasonably prudent operator *under the circumstances* of having given the owners assurances that it intended to continue to operate the Brothers well to hold the leases in effect.

The party moving for summary judgment must demonstrate the absence of fact issues by identifying portions of the pleadings, discovery, and affidavits which support its position. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552-53. If the movant fails to meet this initial burden, the non-moving party has no burden to produce evidence, even if the non-moving party bears the burden of proof at trial. *Russ v. International Paper Co.,* 943 F.2d 589, 592 (5th Cir.1991).

Apache has not met its initial burden under *Celotex.* Thus, whether Apache took upon itself the duty to continue to operate the Brothers well or to take reasonable action to prevent the loss of the Brothers Unit leases and, if so, whether Apache breached its duty by failing to act as a reasonably prudent operator under these circumstances are genuine fact issues. We therefore conclude that summary judgment was inappropriate.

Apache also failed to meet its initial burden under *Celotex* with respect to the owners' claim that Apache misrepresented to the owners that it continued to operate the Brothers well by sending the owners monthly billing statements from July through November 1990. Although the district court determined that Apache's sending these billing statements indicated that Apache did not, as a matter of law, misrepresent the production status of the Brothers well, the district court reached this conclusion by relying on facts for which there is no support in the record, e.g., that these monthly statements provided the owners with revenue and expense information from the well and that they clearly indicated that from mid-July 1990 onward the Brothers well generated little or no income.

None of these monthly statements or a factual description of the contents therein is evidenced in the record. Further, although in its motion for summary judgment Apache characterized these billing statements as being "similar" to those sent by the operator to the working interest owners in *Fuller,* which put the working interest owners on notice that the well was decreasing in production, there is no evidence in the record to support this assertion.[3]

Additionally, even though Apache argued that it was not released from continuing responsibilities for the well until the well was plugged and hence that it continued to serve as the operator of the well, it offered no evidence of any "operations" conducted on the well during that time. In fact, as we have already pointed out, evidence was introduced to suggest just the opposite.

We thus conclude that there exists a genuine issue of material fact of whether Apache misrepresented to the owners that it was continuing to produce the Brothers well from July through November 1990. Accordingly, the district court erred in granting summary judgment to Apache on the owners' misrepresentation claim.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's denial of the owners' motion to amend their complaint and the court's dismissal of the owners' claim of fraud on the pleadings. We AFFIRM in part and REVERSE in part the district court's grant of summary judgment in favor of Apache and REMAND for further proceedings consistent with this opinion. Each party is to bear its own costs.

W. EUGENE DAVIS, Circuit Judge, concurring in part, dissenting in part:

I concur in the thorough majority opinion except for its treatment of one issue. I disagree with the majority's conclusion that a rational jury could find that Apache agreed (or led plaintiffs to believe that it had agreed) to continue production of the Brothers well or notify plaintiffs of its intent to abandon the well. The majority's conclusion is predicated solely on an exchange of correspondence

---

[3]We note that the owners produced summary judgment evidence that Apache admitted that it had charged the owners administrative overhead for the Brothers well based on the *producing* well rate computed under the operating agreement in these billings. Apache also admitted, however, that these billings were eventually corrected and reversed.

between one of the plaintiffs and Apache.

The purpose of Roy Richard's January 25, 1989 letter to Apache was to persuade Apache to discontinue operating the Brothers well. After detailing the well's income and expenses, Mr. Richard stated: "our group feels it is simply not feasible from a financial standpoint to continue operating the Brothers well. We are formally requesting that operations, production, and the incurring of additional expenses on the Brothers well cease immediately." Mr. Richard then requested a reply to the letter and an explanation of any reasons Apache might have for not terminating operations.

Less than a month later, Apache advised Mr. Richard that Apache "does not plan on discontinuing operations on the subject well at this time." David Tirey, on behalf of Apache, gave two reasons for declining to terminate operations. First, he advised Mr. Richard that: "At the present time, termination of operations on the Brothers well would not allow us to keep the leasehold acreage. This would allow another operator to pick up the acreage, and drill another well which would drain reserves from our Christian unit." Second, he observed that: "We recently have reduced our saltwater disposal costs on the lease, which should put the lease in a profitable position." Mr. Tirey closed the letter by stating: "If you have other questions, please do not hesitate to call." Plaintiffs made no further contact with Apache.

The majority apparently concludes that a factfinder could conclude from Apache's letter that Apache agreed to maintain production on the Brothers well or notify plaintiffs if it decided to terminate production. I fail to see how this correspondence can raise such an inference.

Apache did not undertake to do anything. It *declined* Mr. Richard's request to terminate production. If plaintiffs, after they received Apache's February 20 response, wanted Apache to continue production to maintain the leases despite the losses they were suffering on the operation of the wells, the ball was in plaintiffs's court; it was up to them to retract their earlier request that Apache terminate production. But plaintiffs did not respond to Apache's February 20 letter. In the absence of a response, Apache was entitled to assume that Mr. Richard's request for termination of production of the Brothers well was still outstanding.

A plain reading of the summary judgment evidence fails to disclose an assumption by Apache

of an obligation to notify plaintiffs of their intent to terminate production. I would therefore affirm the district court's summary judgment in favor of Apache on plaintiff's claim that Apache breached its obligation to perform in a good and workmanlike manner by failing to notify plaintiffs of its intent to terminate production at the Brothers well.